**OHIO VALLEY ENVIRONMENTAL COALITION, et al., Plaintiffs,**

v.

**Marianne Lamont HORINKO, Acting Administrator, United States Environmental Protection Agency, Defendant.**

No. CIV.A. 3:02–0059.

United States District Court, S.D. West Virginia, Huntington Division.

Aug. 29, 2003.

James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, John W. Barrett, Joseph M. Lovett, Appalachian Center for the Economy and the Environment, Charleston and Lewisburg, WV, for Plaintiffs Ohio Valley Environmental Coalition, West Virginia Rivers Coalition, Inc., West Virginia Highlands Conservancy, Inc., Greenbrier River Watershed Association, Coal River Mountain Watch, West Virginia Citizen Action Group, Friends of the Cheat, Inc., Friends of the Cacapon, Inc., American Whitewater Affiliation, Blue Heron Environmental Network, Inc., Stanley Heirs Foundation, Inc., Concerned Citizens Coalition of Roane, Calhoun and Gilmer Counties, Wheeling Environmentalists, Friends of the Little Kanawha, Plateau Action Network, Inc., Winnie Fox, Elinore Taylor, Francis D. Slider, Denise Giardina, Julian Martin, Regina M. Hendrix, Kathryn A. Stone, Doyle Coakley, Abby Chapple, and Dick Latterell.

Kasey Warner, United States Attorney, Michael L. Keller, Assistant United States Attorney, United States Attorney's Office, Charleston, WV, Thomas L. Sansonetti, Mark A. Nitezynski, United States Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Denver, CO, for Defendant Marianne Lamont Horinko, Acting Administrator, United States Environmental Protection Agency.

Thomas H. Zerbe, Armando Benincasa, Perry D. McDaniel, West Virginia Department of Environmental Protection, Office of Legal Services, Charleston, WV, for De-

fendant–Intervenor West Virginia Department of Environmental Protection.

Robert R. Waters, Waters Law Office, Huntington, WV, F. Paul Calamita, McGuire Woods, Christopher D. Pomeroy, Aqualaw, Richmond, VA, for Defendant–Intervenor West Virginia Municipal Water Quality Association.

Alexandra Dapolito Dunn, General Counsel, Association of Metropolitan Sewerage Agencies, Washington, DC, for Defendant–Intervenor Association of Metropolitan Sewerage Agencies.

David L. Yaussy, Anne C. Blankenship, Elizabeth K. Appel, Robinson & McElwee, Robert P. Paulson, M. Ann Bradley, Joseph M. Dawley, Spilman, Thomas & Battle, Robert G. McLusky, Kathy G. Beckett, Jackson Kelly, Leonard B. Knee, Bowles Rice McDavid Graff & Love, Charleston, WV, for Defendant–Intervenors The Contractors Association of West Virginia, Independent Oil and Gas Association of West Virginia, West Virginia Chamber of Commerce, West Virginia Coal Association, West Virginia Farm Bureau, West Virginia Forestry Association, West Virginia Hospitality and Travel Association, West Virginia Manufacturers Association, and West Virginia Oil and Natural Gas Association.

Fredric P. Andes, Barnes & Thornburg, Chicago, IL, for Defendant–Intervenor Federal Water Quality Coalition.

## MEMORANDUM OPINION & ORDER

GOODWIN, District Judge.

This case involves a challenge to the Environmental Protection Agency's (the EPA's) decision, pursuant to its authority under section 303(c) of the Clean Water Act, 33 U.S.C. § 1313(c), to approve the State of West Virginia's antidegradation implementation procedures, a set of procedures designed to prevent the degradation of the State's waters. For the reasons that follow, the court concludes that the EPA acted arbitrarily and capriciously in approving West Virginia's antidegradation procedures. With respect to seven particular aspects of West Virginia's program, the EPA failed to ensure that West Virginia's procedures met minimum federal requirements, as defined by the Clean Water Act and the EPA's own regulations. In some instances there is simply insufficient evidence in the administrative record to support certain aspects of West Virginia's implementation procedures and, correspondingly, the EPA's approval of those procedures. For example, West Virginia has classified the main segments of the Kanawha and Monongahela Rivers as Tier 1 waters, but there is almost no evidence in the record about the water quality of these rivers that would justify the decision to deny them the more stringent protection of Tier 2. *See infra* at IV.1. Nor is there sufficient evidence in the record explaining how Tier 2 review, which is location-specific and requires public participation, could be done at the time a general section 402 or section 404 permit was issued, rather than at the time new individual discharges are proposed. *See infra* at IV.4. In other instances, West Virginia's regulations simply fail to require the minimum protections required by the EPA's regulations, and the EPA's approval of West Virginia's procedures was based on an unreasonable attempt to effectively amend the plain meaning of those provisions so as to bring them into line with federal requirements. For example, West Virginia's procedures allow new or expanded discharges from certain wastewater treatment plants to evade Tier 2 review if the new discharge results in a "net decrease in the overall pollutant loading." The EPA approved this provision as consistent with minimum federal standards by, in effect, amending it to apply only when there is a net decrease in

the pollutant loading for *each* pollutant parameter. *See infra* at IV.3.

Apart from the seven instances where the EPA failed to ensure that West Virginia's procedures met minimum federal requirements, however, the court rejects the plaintiffs' challenges to six other aspects of West Virginia's procedures. The EPA's conclusion that these six aspects of West Virginia's procedures satisfied minimum federal requirements was reasonable and supported by the evidence in the record. For example, the EPA reasonably concluded that best management practices for nonpoint source pollution will be "achieved," as required by EPA regulations, if those practices are "installed and maintained," as required by West Virginia's procedures. *See infra* at IV.5. Similarly, there was sufficient evidence in the record to support the EPA's approval of a provision allowing for a *de minimis* ten percent reduction in the available assimilative capacity of Tier 2 waters before Tier 2 review is required. *See infra* at IV.8.

That said, because the EPA failed to ensure, in a number of respects, that West Virginia's antidegradation implementation procedures were consistent with minimum federal requirements, the EPA's approval of West Virginia's procedures was arbitrary, capricious, and an abuse of discretion. Accordingly, the court **VACATES** the EPA's approval of West Virginia's antidegradation procedures and **REMANDS** to the EPA for further proceedings consistent with this opinion.

## I. Background

The Clean Water Act (CWA or the Act), 33 U.S.C. § 1251 *et seq.*, was passed by Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.

§ 1251(a) (2003). In particular, the CWA seeks to eliminate "the discharge of pollutants into the navigable waters" of the United States, and to "provide[ ] for the protection and propagation of fish, shellfish, and wildlife and provide[ ] for recreation in and on the water." *Id.* at §§ 1251(a)(1) & (a)(2).[1] The Supreme Court has explained that the CWA requires the Administrator of the EPA to "establish and enforce technology-based limitations on individual discharges into the country's navigable waters from point sources," and also "requires each State, subject to federal approval, to institute comprehensive water quality standards establishing water quality goals for all intrastate waters." *PUD No. 1 of Jefferson County v. Washington Dept. of Ecology*, 511 U.S. 700, 704, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). Under a 1987 amendment to the Act, State water quality standards must include an antidegradation policy, which is "a policy requiring that state standards be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." *Id.* at 705, 114 S.Ct. 1900; *see also* 33 U.S.C. § 1313(d)(4)(B). Pursuant to this statute, the EPA promulgated a regulation governing antidegradation, 40 C.F.R. § 131.12. Section 131.12 requires States to "develop and adopt a statewide antidegradation policy and identify methods for implementing such policy." 40 C.F.R. § 131.12(a) (2003). Section 131.12 further provides that "[t]he antidegradation policy and implementation methods shall, at a minimum, be consistent" with certain federal standards specified in the regulation. *Id.* States must submit their antidegradation policy and implementation procedures to the EPA. 33 U.S.C. § 1313(c)(2)(A). If the State's policy and procedures are consistent with the

---

**1.** Actually, § 1251(a)(1) provides in full that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985 . . . ." Suffice it to say that this goal has yet to be achieved.

minimum federal standards, the EPA must approve the procedures within sixty days. *Id.* at 1313(c)(3). If not, the EPA must, within ninety days, "notify the State and specify the changes to meet such requirements. If such changes are not adopted by the State within ninety days after the date of notification, the Administrator shall promulgate such standard pursuant to paragraph (4) of this subsection." *Id.*

On April 14, 2001, the West Virginia legislature passed West Virginia's antidegradation implementation procedures, codified in Title 60, Series 5, of West Virginia's Code of State Regulations.[2] West Virginia submitted those procedures to the EPA on July 5, 2001, and the EPA approved the procedures on November 26, 2001.[3] On January 23, 2002, the plaintiffs, a group of concerned citizens and environmental and recreational organizations, brought this suit challenging the EPA's approval of West Virginia's procedures.[4]

The plaintiffs claimed that the EPA's approval of West Virginia's antidegradation implementation procedures was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and sought a declaration to that effect, an order setting aside the EPA's approval and remanding the case to the EPA for further proceedings, and an award of costs and expenses, including reasonable attorneys' and expert witness fees, under 28 U.S.C. § 2412.[5] In particular, the plaintiffs contend that a number of provisions of West Virginia's antidegradation implementation procedures are inconsistent with EPA regulations implementing the Clean Water Act. The primary regulation at issue is 40 C.F.R. § 131.12.

The parties in this case, in addition to the plaintiffs and the EPA, include a number of defendant-intervenors. The defendant-intervenors are organized into three groups: the Industrial Intervenors[6]; the

**2.** To be perfectly clear, the court emphasizes that the plaintiffs' challenge here involves West Virginia's antidegradation *implementation procedures*, not its antidegradation policy. West Virginia's antidegradation policy was approved by EPA in 1995. *See* Administrative Record [AR] at 638. The antidegradation implementation procedures, inclusive of appendices, are found in the Administrative Record at pages 5–42.

**3.** While the EPA failed to approve West Virginia's procedures within 60 days, as required by § 1313(c)(3), no party has challenged the EPA's approval on that basis.

**4.** The plaintiffs are the Ohio Valley Environmental Coalition, West Virginia Rivers Coalition, Inc., West Virginia Highlands Conservancy, Inc., Greenbrier River Watershed Association, Coal River Mountain Watch, West Virginia Citizen Action Group, Friends of the Cheat, Inc., Friends of the Cacapon, Inc., American Whitewater Affiliation, Blue Heron Environmental Network, Inc., Stanley Heirs Foundation, Inc., Concerned Citizens Coalition of Roane, Calhoun and Gilmer Counties, Wheeling Environmentalists, Friends of the Little Kanawha, Plateau Ac-

tion Network, Inc., Winnie Fox, Elinore Taylor, Francis D. Slider, Denise Giardina, Julian Martin, Regina M. Hendrix, Kathryn A. Stone, Doyle Coakley, Abby Chapple, and Dick Latterell. In addition, the Sierra Club, the Wilderness Society, Stewards of the Potomac Highlands, Inc., and River and Trail Outfitters have joined in the case as plaintiff-intervenors.

**5.** The plaintiffs' cause of action arises under 5 U.S.C. § 702, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

**6.** The Industrial Intervenors consist of the Contractors Association of West Virginia, the Independent Oil and Gas Association of West Virginia, the West Virginia Chamber of Commerce, the West Virginia Coal Association, the West Virginia Farm Bureau, the West Virginia Forestry Association, the West Virginia Hospitality and Travel Association, the West Virginia Manufacturer's Association, and the West Virginia Oil and Natural Gas Association.

Municipal Intervenors [7]; and the West Virginia Department of Environmental Protection (WVDEP). The parties have filed cross-motions for summary judgment, and the matter is ripe for decision.

Prior to turning to the merits of the case, the court will briefly discuss the relevant provisions of § 131.12. Section 131.12 provides, in relevant part, that a State's antidegradation policy and procedures must ensure that:

(1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

(2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for non-point source control.

(3) Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological signifi-cance, that water quality shall be maintained and protected.

40 C.F.R. § 131.12(a)(1)-(3). These three provisions establish what are commonly referred to as three "tiers" of antidegradation protection. *See Am. Wildlands v. Browner,* 260 F.3d 1192, 1194 (10th Cir. 2001). Tier 1 applies to all waters, and requires that existing water *uses* be protected. 40 C.F.R. § 131.12(a)(1). Tier 2 applies to high quality waters, defined as waters "[w]here the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water." *Id.* § 131.12(a)(2). In Tier 2 waters, water *quality* (as opposed to *uses*) "shall be maintained and protected" unless the State finds, after a process of public participation, "that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located." *Id.* This process of public participation and a finding of economic or social necessity is known as Tier 2 review. Tier 3 applies to high quality waters that "constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance." *Id.* § 131.12(a)(3). In Tier 3 waters, "water quality shall be maintained and protected," with no exception for economic or social necessity. *Id.* The bulk of the plaintiffs' objections to the EPA's action here involve how West Virginia's procedures provide for classification of waters as Tier 2 waters and the circumstances in which Tier 2 review is required.

## II. Standard of Review

As noted above, this court reviews the EPA's decision to approve West Virginia's antidegradation implementation proce-

---

**7.** The Municipal Intervenors consist of the West Virginia Municipal Water Quality Association, the West Virginia Municipal League, and the Association of Metropolitan Sewerage Agencies.

dures only to ensure that the approval was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[8] This standard of review is "narrow," and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). That said, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotations and citation omitted). Under the arbitrary and capricious standard, the court "presume[s] the validity of Agency action," and the court's job is simply "to scrutinize the Agency's activity to discern whether the record reveals that a rational basis exists for the Agency's decision." *Reynolds Metals Co. v. EPA,* 760 F.2d 549, 558 (4th Cir.1985).

When reviewing a federal agency's interpretation of a statute that it administers, the court "first ask[s] 'whether Congress has directly spoken to the precise question at issue.'" *Satellite Broad. & Communications Ass'n v. FCC,* 275 F.3d 337, 369 (4th Cir.2001) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "If [the court] can discern Congress's intent ... by using 'traditional tools of statutory con-

struction,' [the court] must give effect to that intent." *Id.* (quoting *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778). On the other hand, if "the statute is 'silent or ambiguous' about the issue, we must defer to the agency's reasonable construction of the statute." *Id.* (quoting *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778). "This analytical approach applies not only when a regulation is directly challenged, ... but also when a particular agency action is challenged," as is the case here. *Kentuckians for the Commonwealth v. Rivenburgh,* 317 F.3d 425, 439 (4th Cir.2003) (emphasis omitted). The court also defers to the EPA's reasonable interpretation of its regulations, unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (quotations and citation omitted).

■ As for an agency's factual findings, the court "should accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole," even if there are "alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (citation omitted). "[P]articular deference is given by the court to an agency with regard to scientific matters in its area of technical expertise." *Nat'l Wildlife Fed'n v. EPA,* 286 F.3d 554, 560 (D.C.Cir.2002).

---

8. Section 706 also provides that in reviewing the agency's action, "the court shall review the whole record or those parts of it cited by a party." In this case, the court has reviewed the EPA's conclusions primarily in light of the evidence cited by one of the parties either in support of or in opposition to the EPA's decision. The court has also reviewed materials in the record not directly cited in support of or against a particular position but which the court determined might be relevant to the issue at hand. The court has not, however, conducted an independent, exhaustive review of the record in search of evidence, not cited by any party, that might conceivably support a party's position. *See, e.g., Johnson v. Cambridge Indus.,* 325 F.3d 892, 895 (7th Cir. 2003) ("[t]he district court was ... entitled to rely on the materials each party cited."); *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 672 (10th Cir.1998) ("The district court has discretion to go beyond the referenced portions of these materials, but is not required to do so.... [Courts are] wary of becoming advocates who comb the record of previously available evidence and make a party's case for it.").

■ To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c). In this case, the only material facts are those contained in the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Virginia Agr. Growers Ass'n v. Donovan,* 774 F.2d 89, 92 (4th Cir.1985). Furthermore, as stated above, this court will accept the EPA's factual findings "if those findings are supported by substantial evidence on the record as a whole." *Arkansas,* 503 U.S. at 113, 112 S.Ct. 1046. If the administrative record does reveal some genuine issue of material fact—that is, if the evidence in the administrative record could reasonably support different factual conclusions—the court defers to the EPA's reasonable resolution of that factual question. To put it another way, when a court reviews an agency action, the "plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits." *Krichbaum v. U.S. Forest Service,* 17 F.Supp.2d 549, 556 (W.D.Va. 1998). Accordingly, this matter is appropriately resolved on cross-motions for summary judgment.

## III. Standing

■ Under Article III of the United States Constitution, "[t]he judicial Power [of the United States] shall extend to all Cases ... [and] Controversies ...." U.S. Const. art. III, § 2. Among other things, the "case and controversy" requirement ensures that the federal judicial power can be exercised only when a plaintiff has standing to bring suit. *See Friends of the Earth, Inc. v. Gaston Copper Recycling*

*Corp.,* 204 F.3d 149, 153 (4th Cir.2000). "The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Id.* In this case, the EPA has not challenged the plaintiffs' standing to bring suit. Nor do the WVDEP or the Industrial Intervenors question the plaintiffs' standing in this case. The only parties to challenge the plaintiffs' standing are the Municipal Intervenors. Because Article III standing is a jurisdictional requirement, this court must satisfy itself of a plaintiff's standing regardless of whether any party has raised the issue. *See Bernhardt v. County of Los Angeles,* 279 F.3d 862, 868 (9th Cir.2002); *Skrzypczak v. Kauger,* 92 F.3d 1050, 1052 (10th Cir.1996); *Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1223 (4th Cir.1980).

■ To demonstrate Article III standing, a "plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Services, Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The Fourth Circuit has explained that "[i]n the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 517 (4th Cir.2003). In order to demonstrate their standing in this case, the plaintiff organizations filed affidavits from eight of their members articulating the types of harms they would suffer as a result of the EPA's approval of West Virginia's antidegradation procedures.[9]

9. "An organization has representational standing when (1) at least one of its members would have standing to sue in his own right;

(2) the organization seeks to protect interests germane to the organization's purpose; and

Michael Hartman states that he has long participated in boating, fishing, and swimming in the Kanawha River, and plans to continue to do so.[10] Pls.' Op. Br., App. 1. He also enjoys watching the Kanawha River from a riverside park in his hometown of St. Albans, West Virginia. *Id.* He expresses concern that any degradation of the water quality of the Kanawha River will impair his recreational and aesthetic enjoyment of the river. *Id.* He also claims that a clean environment is critical to the region's social and economic growth, because a clean environment is a primary concern for new individuals and businesses considering relocation to West Virginia. *Id.* A lowering of the water quality in the river, he states, will harm his interest in the area's continued social and economic growth and vitality. *Id.*

Liz Garland, a resident of Elkins, West Virginia, states that she is an avid whitewater canoeist and that she paddles on a number of the State's rivers and streams.[11] Pls.' Op. Br., App. 2. She expresses concern over contact with pollutants in the waters where she canoes and states that a reduction in the quality of these waters would cause her to limit or end her canoeing activities in those waters. *Id.*

Deborah Wise, a resident of Morgantown, West Virginia, states that the main source of her drinking water is the Monongahela River.[12] Pls.' Op. Br., App. 3. In addition, she serves as a raft guide in the Gauley, Cheat, Cherry, and New Rivers. *Id.* She expresses concern that degradation of these waters would cause her loss of income as well as loss of her own recreational enjoyment. *Id.*

Leslee McCarty, a resident of Hillsboro, West Virginia, states that she operates a bed and breakfast near the Greenbrier River and frequently swims or kayaks in the Greenbrier and other rivers in the State.[13] Pls.' Op. Br., App. 4. She states that her bed and breakfast guests are often concerned about the quality of the Greenbrier River. *Id.* She expresses concern that any decline in the quality of water in these rivers would decrease her aesthetic enjoyment of these rivers, as well as the economic and recreational benefits that the rivers provide her. *Id.* A number of other individuals claim similar aesthetic, recreational, and economic interests in the water quality of a number of the State's water bodies. Pls.' Op. Br., App. 5–8.

The Municipal Intervenors argue that the plaintiffs cannot demonstrate a concrete and particularized injury because West Virginia's implementation procedures fully require the State to maintain and protect existing instream water uses. So long as existing *uses* are protected, they argue, any failure by the State to adequately protect water *quality* cannot cause any concrete, actual harm. The Municipal Intervenors' argument boils down to the

(3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit." *Gaston Copper*, 204 F.3d at 155 (citation omitted). There is no dispute in this case that if the individual affiants have standing to sue, the plaintiff organizations of which they are members also have standing.

10. Mr. Hartman is a member of the West Virginia Rivers Coalition, West Virginia Citizen Action Group, West Virginia Highlands Conservancy, and the Ohio Valley Environmental Coalition.

11. Ms. Garland is a member of the West Virginia Rivers Coalition and the Plateau Action Network.

12. Ms. Wise is a member of the West Virginia Rivers Coalition.

13. Ms. McCarty is a member West Virginia Highlands Conservancy and the West Virginia Citizen Action Group, and is the coordinator of the Greenbrier River Watershed Association.

position that no party can ever have standing to challenge the EPA's approval of a State's antidegradation plan on the grounds that the plan does not comply with the minimum requirements of Tier 2 or Tier 3, which protect water *quality*, as opposed to Tier 1, which protects existing *uses*. This is because, they argue, no actual, concrete injury can ever flow from a State's failure to protect water quality, so long as the State adequately protects the existing uses of a water body.

■ The court disagrees. The Supreme Court has explained that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing ....'" *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). That is to say, Congress may, by statute, create cognizable legal interests, the injury of which suffices for Article III standing. Contrary to the Municipal Intervenors' assumption, the Clean Water Act is not concerned solely with protecting existing uses of the nation's waters. The Act is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In addition to protecting wildlife and recreation, *id.* § 1251(a)(2), the Act seeks to eliminate "the discharge of pollutants into the navigable waters." *Id.* § 1251(a)(1). These provisions make clear that the Act is not concerned solely with the *uses* of waters, but also with the *quality* of waters. The plaintiffs in this case have "alleged precisely those types of injuries that Congress intended to prevent by enacting the Clean Water Act." *Gaston Copper*, 204 F.3d at 156. Specifically, they have alleged a threat of harm to their aesthetic, recreational, and economic interests protected by the Clean Water Act's goal of maintaining water quality. *See id.* at 154 (holding that damage to aesthetic, recreational, or economic interests can constitute injury in fact). Even if the lowering of water quality does not affect existing uses, such as fishing or swimming, that lower water quality could still affect the plaintiffs' aesthetic and economic interests. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183, 120 S.Ct. 693 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

The plaintiffs state that they enjoy and value the visual beauty of the State's rivers. Water degradation, even degradation that does not result in the elimination of aquatic life or danger to human use or consumption, could still impact a water body's clarity and appearance. In addition to damaging the plaintiffs' aesthetic interests, such degradation could also injure their economic interests, which depend on the aesthetic enjoyment of others. Deborah Wise's work as a whitewater raft guide would be affected by a decrease in her clients' aesthetic enjoyment of the water. The same is true of Leslee McCarty and the guests that frequent her bed and breakfast. The individual affidavits, the factual content of which is not contested, illustrate how West Virginia's antidegradation procedures will "affect the plaintiff[s] in a personal and individual way," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and serve to "differentiate [the plaintiff organizations] from the mass of people who may find the conduct ... objectionable only in an abstract sense." *Gaston Copper*, 204 F.3d at 156.

■ The court is also satisfied that these threatened injuries are "actual or imminent, not conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180, 120 S.Ct. 693. Here, the individual affiants currently use

a number of West Virginia's waterways for a variety of specific activities and have demonstrated a legally protected interest in maintaining the quality of that water. There is no doubt that West Virginia's regulations would permit a greater reduction in water quality than what would be permitted under the plaintiffs' version of the minimum federal requirements. For example, if the plaintiffs' claims are correct on the merits, West Virginia cannot allow a twenty percent cumulative reduction in the assimilative capacity of a given water body without conducting Tier 2 review.[14] *See infra* part IV.8. Similarly, if the Kanawha and Monongahela Rivers should be classified as Tier 2 water bodies, West Virginia's classification of those rivers as Tier 1 will certainly permit greater degradation of those rivers' water quality. *See infra* part IV.1. Accordingly, the court concludes that the threatened injury to the plaintiffs caused by the EPA's approval of West Virginia's antidegradation procedures is actual and imminent.[15]

The United States District Court for the District of Colorado reached the same conclusion in a case involving almost identical circumstances. In *American Wildlands v. Browner*, 94 F.Supp.2d 1150 (D.Colo.2000), the court held that the plaintiffs, a group of environmental organizations, had standing to bring suit challenging the EPA's approval of revisions to Colorado's water quality standards, including Colorado's an-

tidegradation implementation procedures. *Id.* at 1155–56. The court found standing based on affidavits, filed by individual members of the organizations, detailing those individuals' "aesthetic, conservation, and economic interests in preserving Montana's waters" and the individuals' "use of these waters in the form of drinking, fishing, swimming, and agricultural and household use." *Id.* at 1155. The supporting affidavits are very similar to those submitted here. *Id.* The court held that the affidavits "suffice[d] to establish [the individuals] have suffered an injury in fact to their aesthetic, conservation, and economic interests." *Id.* at 1156.[16]

Having satisfied itself of the plaintiffs' injury in fact, the court has little trouble concluding that "the injury is fairly traceable to the challenged action of the defendant" and that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 180–81, 120 S.Ct. 693. The Municipal Intervenors do not contest these elements (nor does any other party). If, as this court has concluded, the plaintiffs will suffer injury in fact from a reduction in water quality in West Virginia's rivers, it is clear that this injury is traceable to the EPA's approval of West Virginia's allegedly substandard antidegradation procedures, and that a favorable judicial decision could redress this injury by causing the promulgation (either by the State or

14. To determine standing, the court assumes the validity of the plaintiffs' claims on the merits. *See Warth*, 422 U.S. at 500, 95 S.Ct. 2197; *Campbell v. Clinton*, 203 F.3d 19, 34–35 (D.C.Cir.2000).

15. The fact that the harms flowing from water degradation are merely threatened by the EPA's approval of West Virginia's procedures rather than already occurring does not undermine the plaintiffs' standing, for there is "no doubt that threatened injury to [a plaintiff] is by itself injury in fact." *Gaston Copper*, 204 F.3d at 160. In addition, while a claimed

injury must be actual, it "'need not be large, an identifiable trifle will suffice.'" *Id.* at 156 (quoting *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir.1996)).

16. On the merits, the court granted summary judgment to the EPA, and this decision was affirmed on appeal by the Tenth Circuit. *Am. Wildlands v. Browner*, 260 F.3d 1192 (10th Cir.2001). Because the Tenth Circuit affirmed the court's grant of summary judgment to the EPA, that court did not address the plaintiffs' standing.

the EPA) of stricter regulations. Accordingly, the court concludes that the plaintiffs in this case have standing to challenge the EPA's approval of West Virginia's antidegradation procedures.

## IV. Merits

█ The court now turns to the merits of the plaintiffs' claims. In the plaintiffs' motion for summary judgment, the plaintiffs allege ten specific instances in which West Virginia's antidegradation implementation procedures are inconsistent with minimum federal requirements, and in which the EPA's approval of West Virginia's procedures was therefore arbitrary and capricious.[17] Each of the challenges involves a particular aspect of West Virginia's procedures. For the most part the challenges are independent of one another and therefore resist a general summary. Without attempting a summary, then, the court will address these issues in the order raised by the plaintiffs.

### 1. Classification of segments of the Kanawha and Monongahela Rivers as Tier 1 waterways

█ Section 60–5–4.3 of West Virginia's antidegradation implementation procedures provides that:

> In determining whether a water segment is afforded only Tier 1 protection, the agency will focus on whether the water segment is meeting or failing to meet minimum uses, except that, notwithstanding any other provision of this rule, the main stems of the Monongahela River, and the Kanawha River from milepoint 72 to the confluence with the Ohio River shall be afforded Tier 1 protection only.

The plaintiffs argue that there is insufficient evidence in the administrative record to permit the EPA to conclude that these segments of the Monongahela and Kanawha Rivers are not entitled to Tier 2 protection. In fact, the plaintiffs state that the only evidence in the record regarding the water quality levels in these river segments indicates that they should be categorized as Tier 2 waterways. The plaintiffs point to a letter by Jeffrey Towner of the United State Fish and Wildlife Service (USFWS) written to the EPA in response to the EPA's request for comments on West Virginia's proposed antidegradation implementation procedures. In this letter, the USFWS objects to the classification of these river segments as Tier 1 waters, stating that "water quality parameters in these waters exceed levels necessary to support minimum use and [the waters] are therefore Tier 2 waters." AR 633.

In response, the EPA argues that "EPA's antidegradation regulation gives states the discretion regarding how to identify 'high quality waters' that are afforded Tier 2 protection." EPA Op. Br. at 48. Specifically, the EPA argues that states may choose to use either a "pollutant-by-pollutant" approach or a "water body-by-water body" approach to classifying water segments. The court agrees with the EPA that its regulations give states some discretion in how they identify waters as Tier 2 waters. The EPA discusses its approach to Tier 2 waters in its advanced notice of proposed rulemaking (ANPRM) for 40 C.F.R. Part 131. *See* Water Quality Standards Regulation, 63 Fed.Reg. 63,742 (proposed July 7, 1998) (to be codified at 40 C.F.R. pt. 131); AR 514–79.[18] In the ANPRM, the EPA states that § 131.12(a)(2), the regulation establishing

---

**17.** The plaintiffs' complaint raises additional issues that have not been argued on summary judgment. Claims raised in a complaint but not argued to the court are deemed to be waived. *Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 810 (7th Cir.2001). In addition, the plaintiffs have withdrawn their challenge to

section 60–5–6.3.k, dealing with short-term water quality impacts. *See* Pls.'s Reply Br. at 30 n. 17.

**18.** For administrative materials available in the administrative record, such as this docu-

the Tier 2 designation, "does not include specific guidelines for identifying high quality waters." 63 Fed.Reg. 63,742, 36,-782; AR 555. The EPA notes that various EPA guidance documents "make a variety of suggestions concerning approaches to defining tier 2 waters," and that "States and Tribes have developed various ways to identify tier 2 waters." *Id.* In particular, the EPA states that the various approaches to classifying waters "fall into two basic categories: (1) pollutant-by-pollutant approaches; and (2) water body-by-water body approaches." *Id.*

Under the pollutant-by-pollutant approach, the State makes a classification for each pollutant in a given water body. The water body is classified as Tier 2 for those pollutants for which "water quality is better than applicable criteria . . . ." *Id.* The same water body therefore could be classified as Tier 2 for certain pollutants and Tier 1 for other pollutants: "available assimilative capacity for any given pollutant is always subject to tier 2 protection, regardless of whether the criteria for other pollutants are satisfied." *Id.* Under the water body-by-water body approach, States "weigh a variety of factors to judge a water body segment's overall quality." *Id.* Tier 2 classification is based on the overall quality of the water body segment, not on individual pollutants. *Id.* The EPA stated that "[t]here are advantages and disadvantages to each approach," and that "either, when properly implemented, is acceptable." *Id.* The pollutant-by-pollutant approach may be "easier to implement because the need for an overall assessment considering various factors is avoided" and "may result in more waters receiving some degree of tier 2 protection" because the overall quality need not be high. *Id.* On the other hand, the water body-by-water

body approach "allows for a weighted assessment of chemical, physical, biological, and other information (e.g., unique ecological or scenic attributes)," and thus "may be better suited to EPA's stated vision for the water quality standards program: refined designated uses with tailored criteria, complete information on uses and use attainability, and clear national norms." 63 Fed. Reg. 63,742, 36,783; AR 556. A danger in the water body-by-water body approach is that a State might not "develop inclusive qualification criteria" but might define overall water quality so as to include only a "narrow universe of waters," excluding "many deserving high quality waters." *Id.*

While the plaintiffs do not concede that the water body-by-water body approach is an acceptable manner of classifying waters, they spend the bulk of their energies arguing that even assuming this approach is permissible in general, West Virginia's designation of the main segments of the Kanawha and Monongahela Rivers in this case is unsupported by evidence. In light of the EPA's regulation, which does not specify a particular approach to classification, and in light of the EPA's explanation of why either approach is acceptable, the court concludes that the EPA's regulations permit a State to adopt a water body-by-water body approach to classification, assuming that this approach is implemented adequately. As such, the court agrees with the EPA that there is nothing inherently problematic about West Virginia's designation of large river segments as Tier 1 waters, assuming that this designation is supported by some data regarding the "chemical, physical, biological, . . . ecological[,] . . . scenic [or other] attributes," *id.*, of those water bodies that justify West Virginia's assessment that these water bodies, overall, are not high quality.

ment, the court will include a citation to the administrative document as well as to the

record.

■ The EPA also argues that using the water body-by-water body approach to designate these river segments as Tier 1 waters allows the WVDEP to focus its limited regulatory resources on the State's Tier 2 waters. In the 1998 ANPRM, the EPA noted that the water body-by-water body approach "allows States . . . to focus limited resources on protecting higher-value State . . . waters." *Id.* The court acknowledges the value of a State focusing its resources on high quality waters, and agrees with the EPA that the water body-by-water body approach may be an effective manner of achieving this benefit. The EPA's regulations place limits, however, on the degree to which a State may exclude some waters from heightened protection so as to devote more resources to higher quality waters. For example, under the three-tier system established in 40 C.F.R. § 131.12, a State could not relegate all waters to Tier 1 classification other than "waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance." 40 C.F.R. § 131.12(a)(3). Even though such a decision would undoubtedly allow the State to devote many more resources to preserving its most important waters (its Tier 3 waters), the regulations do not permit the State to accomplish this goal by denying Tier 2 protection to deserving high quality waters (as defined by § 131.12(a)(2)). The desire to preserve and focus state resources is a permissible goal under the EPA's regulations, but that goal must be implemented in a manner consistent with the regulations' minimum requirements. "The agency charged with implementing the statute is not free to evade the unambiguous directions of the law merely for administrative convenience." *Brown v. Harris,* 491 F.Supp. 845, 847 (N.D.Cal.1980) (citing *Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue,* 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936)).

■ The court is satisfied that the water body-by-water body approach permits a State to make an overall classification of a particular water body without needing to make a classification for each individual pollutant, and that this approach has the benefit of allowing a State to focus its resources on overall high quality waters. The question remains, however, whether the segments of the Kanawha and Monongahela Rivers at issue here are, overall, the sort of "high quality" water bodies deserving of Tier 2 protection. To answer this question, one must know something about the quality of water in those rivers.

Apart from these general points about the regulatory scheme, which the court takes no issue with on an abstract basis, the EPA points to only *one* piece of evidence that pertains directly to the water quality in the Kanawha and Monongahela Rivers. That evidence is the fact that both river segments are on a list of impaired waters prepared by the WVDEP for submission to the EPA under section 303(d) of the Clean Water Act. Section 303(d) requires States to submit to the EPA a list of waters that fail to meet water quality standards for at least one pollutant parameter. *See* 33 U.S.C. § 1313(d). West Virginia's section 303(d) list is not included in the administrative record, but limited excerpts of the State's 2002 list are included as an exhibit to the Industrial Intervenors' Brief in Support of their Motion for Summary Judgment. Ind. Br., Exh. 9. Despite the fact that this list is not in the administrative record, the court takes judicial notice of the list (more specifically, those portions of the list that were submitted to the court), as the list is a formal document produced by the West Virginia DEP and submitted to the EPA. *See City of Charleston v. A Fisherman's Best, Inc.,* 310 F.3d 155, 171–72 (4th Cir. 2002) (taking judicial notice of a fishery

management plan prepared by a federal agency); *Fornalik v. Perryman,* 223 F.3d 523, 529 (7th Cir.2000) ("[I]t is well-established that executive and agency determinations are subject to judicial notice.").

Neither the EPA nor the intervenors give the court much guidance on how to interpret this incomplete document, other than to state that the relevant segments of the Kanawha and Monongahela Rivers are on the list. Page twelve of the document contains a discussion of the Kanawha River and the Monongahela River. Ind. Br., Exh. 9, at 12. According to this discussion, the Kanawha is listed as impaired related to its dioxin levels, but its zinc levels, which were impaired in the past, now satisfy water quality standards. The Monongahela is listed as impaired related to aluminum and fecal coliform levels. According to the EPA, there are 574 waters on this list, and the EPA argues that the fact that West Virginia listed only two of these 574 waters as Tier 1 waters supports the EPA's conclusion that the classification is reasonable. The court disagrees—on the contrary, these facts clearly show that a listing on the State's section 303(d) list is not sufficient to remove a water body from Tier 2 protection and that more evidence is needed.

The EPA does not discuss the Kanawha and Monongahela's particular section 303(d) impairments, or why those impairments render these rivers Tier 1 waters as opposed to other listed waters with similar impairments. For example, the section 303(d) list also includes the Guyandotte River. According to a discussion preceding the listing, the Guyandotte is impaired related to iron, aluminum, and fecal coliform, and the upper segment of that river is also listed for biological impairment. Ind. Br., Exh. 9, at 12. The EPA does not explain why the Monongahela, which is impaired related to aluminum and fecal coliform, is listed as a Tier 1 water body whereas the upper segment of the Guyandotte, which is impaired related to these two pollutants and also for iron and biological impairments, is not listed as a Tier 1 water body.

The EPA has not even attempted to explain why the Kanawha and Monongahela's appearance on the section 303(d) list means that those rivers are not, overall, high quality waters. The EPA itself warned of the risk under the water body-by-water body approach of failing to develop adequate "inclusive qualification criteria" for identifying Tier 2 waters, 63 Fed. Reg. 63,742, 36,783; AR 556, but that is precisely what seems to have occurred here. Apart from the section 303(d) listing, neither the EPA nor the WVDEP has identified *any* qualification criteria—such as chemical, physical, biological, ecological, scenic, or other attributes—against which these river segments (and others) can be judged and classified as Tier 1 or Tier 2.[19]

**19.** The Industrial Intervenors cite to another piece of evidence apart from the section 303(d) list that, they argue, supports the classification of these water bodies as Tier 1 waters. The Kanawha River has been listed on fish advisories released by the West Virginia Department of Health and Human Resources. *See* Ind. Br., Exh. 10. As evidence in support of a Tier 1 designation, however, the fish advisory list suffers from the same serious flaw as the section 303(d) list—other rivers also appear on the list, and there is no explanation for why the advisory for the Kanawha renders it a Tier 1 water as opposed to other waters. *Id.* In addition, the list advises against any consumption of certain specified fish from the lower segment of the Kanawha (carp, catfish, suckers, and hybrid striped bass), but permits up to one meal per month for all remaining fish. *Id.* The Industrial Intervenors do not explain why this particular fish advisory renders the Kanawha a Tier 1 water. As for the Monongahela River, it does not appear on the fish advisory list at all.

In addition, the Industrial Intervenors assert that both of these rivers have been "primary centers for industrial and commercial

In short, there may be legitimate reasons why these two river segments are classified as Tier 1 bodies, but the EPA has not offered any such reasons or identified *anything* in the record (or, in the case of the section 303(d) list, outside of the record) that would support this classification. This court is mindful of its task to "accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole." *Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) (emphasis omitted). In this case, however, the *only* evidence in the record related to the water quality levels in the Kanawha and Monongahela is the letter from the USFWS stating that "water quality parameters in these waters exceed levels necessary to support minimum use and [the waters] are therefore Tier 2 waters." AR 633. The court does not suggest that this letter proves that these river segments merit Tier 2 classification. Rather, the letter, which supports the plaintiffs' position, illustrates the total absence of any contrary record evidence supporting West Virginia's classification of these waters as Tier 1 waters, or supporting the EPA's conclusion that this classification satisfies its regulations.

In light of the total absence of *any* evidence about the quality of water in these river segments apart from their listing on the section 303(d) list, the court concludes that the EPA's approval of section 4.3's classification of these segments of the Kanawha and Monongahela Rivers as Tier 1 waters was arbitrary and capricious.

development in West Virginia for over 200 years," and that both rivers are "the site of electric generating facilities, chemical plants, municipal sewage plants, heavy manufacturing, and coal mining operations." Ind. Br. at 23. These claims are not supported by any citation to the administrative record. Moreover, to the extent the Industrial Intervenors

## 2. Exempting existing permitted uses from antidegradation review

 West Virginia's Tier 2 antidegradation review procedures are set forth in section 60–5–5.6 of the West Virginia regulations. The regulations provide that Tier 2 review is required in any Tier 2 water segment when: (1) "The regulated activity is a new or expanded activity ...," section 5.6.a.1, or (2) "The Secretary [of the WVDEP] determines, upon renewal of a permit or certification, that other individual circumstances warrant a full review such as cumulative degradation resulting from multiple discharges within a watershed, degradation resulting from a single discharge over time, or degradation caused by a regulated facility's historic noncompliance with its permit." Section 5.6.a.2. Thus, Tier 2 review always applies on Tier 2 waters for new or expanded activities but only applies to the renewal of an existing permitted activity when the Secretary of the WVDEP determines that individual circumstances warrant a full review. The plaintiffs argue that all point source discharges, whether pre-existing or new, must undergo Tier 2 review, and that the general exemption for existing permitted discharges and the renewal of such existing discharges is contrary to the EPA's regulations.

The plaintiffs first argue that this exemption is inconsistent with EPA's Tier 2 regulation, which provides that "the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and *existing* point sources." 40 C.F.R. § 131.12(a)(2) (em-

urge the court to take judicial notice of these facts, the court would take equal notice of the remarkable progress that these rivers have made in the past several decades. None of these general observations, however, form a sufficient evidentiary basis for classifying these rivers.

phasis added). This means, the plaintiffs argue, that existing permitted uses must be subjected to Tier 2 review. The EPA correctly points out that the plaintiffs take section 131.12(a)(2)'s reference to "existing point sources" out of context. The plaintiffs confuse the substance of Tier 2 review with the standard for when Tier 2 review is required.

Tier 2 review is required when an activity on a Tier 2 water body threatens to lower the existing water quality. 40 C.F.R. § 131.12(a)(2) (water quality "shall be maintained and protected"). The mention of "existing point sources," in contrast, appears in the latter part of § 131.12(a)(2), which sets out the substance of Tier 2 review. When Tier 2 review is triggered, a lowering of water quality is permissible only after a process of public comment and a finding that the degradation is necessary to accommodate important economic or social development in that area. *Id.* § 131.12(a)(2). But even when the State "allow[s] such degradation or lower water quality, … the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all *new and existing point sources* and cost-effective and reasonable best management practices for nonpoint source control." *Id.* (emphasis added). In other words, even after public participation and a finding of necessity, a new or expanded use is permitted to degrade water quality only when the State assures that all *other* new and existing point sources are achieving the highest regulatory requirements and that nonpoint sources are controlled by best management practices. The reference to "new and existing point sources" in § 131.12(a)(2) does not refer to when Tier 2 review is required, but refers to what the State must assure as to other sources before it will permit additional discharge from a new or expanded source. Thus, the plaintiffs' argument in this regard is without merit.

The plaintiffs next argue that EPA regulations require protection of "existing uses." The phrase "existing uses" is defined in the EPA's regulations as follows: "[e]xisting uses are those uses actually attained in the water body on or after November 28, 1975." *Id.* § 131.3(e). In light of this definition, the plaintiffs argue, any discharge permit issued after November 28, 1975, must be subjected to antidegradation review. The main reference to "existing uses" in the EPA's antidegradation policy is in Tier 1, which provides that "[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Id.* § 131.12(a)(1). Indeed, the EPA notes that Tier 1, which protects "existing uses," "protects the highest use attained in the water body on or after November 28, 1975, whether or not the use is included in the water quality standards." EPA Reply Br. at 10 n. 6. Accordingly, the EPA agrees with the plaintiffs about the meaning of the term "existing uses." The term "existing uses" is not used, however, to establish when Tier 2 review is required. Rather, the regulation provides that "[w]here the quality of the waters *exceed* levels necessary to support … wildlife and recreation in and on the water, that quality shall be maintained and protected …." 40 C.F.R. § 131.12(a)(2) (emphasis added). The present tense use of the verb "exceed" suggests that Tier 2 protections apply to *current* water quality levels, not to any levels that have existed on or after 1975. Nothing elsewhere in the EPA's regulations suggests to the contrary, so the EPA's interpretation of Tier 2 as applying to current water quality levels is reasonable.

Finally, the plaintiffs argue that even if Tier 2 review only protects current water quality levels on Tier 2 waters, it is unreasonable to assume that existing permitted uses will not further lower those levels.

The plaintiffs point to a Guidance Document issued by EPA Region 4, which states that "it is generally accepted that a new or increased volume of discharge will result in the lowering of water quality for a Tier II water body. However, changes in the chemical matrix in industrial wastewater ... due to process/production changes can also result in degradation." Pls.' Op. Br., App. 11, at 3. According to the plaintiffs, this latter sentence shows that the EPA has recognized that existing uses that are not expanded can nonetheless further degrade existing water quality. The EPA responds by quoting from its Water Quality Standards Handbook, which states that "new discharges or expansion of existing facilities would presumably lower water quality and would not be permissible unless the State conducts" Tier 2 review. 1994 Water Quality Standards Handbook, Ch. 4.5, at 4–7 (2d ed.1994); AR 329. This document makes no reference to potential degradation of current water quality levels from pre-existing permitted uses.

In addition, the EPA points out that under West Virginia's plan, Tier 2 review also applies to the renewal of an existing permit when the Secretary of the WVDEP determines "that other individual circumstances warrant a full review." Section 5.6.a.2. The EPA states that "[e]xamples of situations where a full review may be warranted are 'cumulative degradation resulting from multiple discharges within a watershed, degradation resulting from a single discharge over time, or degradation caused by a regulated facility's historic

noncompliance with its permit.'" EPA Op. Br. at 26 (quoting section 5.6.a.2). From the evidence in the record, it appears that the EPA's conclusion that existing uses will not usually degrade water quality is reasonable. West Virginia also has provided for the Secretary to invoke Tier 2 review when circumstances warrant and has specified at least some instances in which Tier 2 review is warranted, such as degradation resulting from a single discharge over time.[20] It was therefore reasonable for the EPA to approve section 5.6.a.2 based on its conclusions that existing discharges will not normally result in further degradation and that West Virginia has ensured Tier 2 review when further degradation does result from an existing discharge or discharges.

3. **Exempting discharges from public wastewater treatment plants when there is a net decrease in overall pollutant loading**

■ Section 60–5–5.6.c of the West Virginia procedures provides that:

A proposed new or expanded discharge from a publicly owned or publicly owned and privately operated sanitary wastewater treatment plant constructed or operated to alleviate a public health concern associated with failing septic systems or untreated or inadequately treated sewage, is exempt from Tier 2 review. This exemption ... applies only where there will be a net decrease in the overall pollutant loading dis-

---

**20.** The court reads the examples listed in section 5.6.a.2 as circumstances where full Tier 2 review *is* warranted, not merely where such review *might be* warranted. No party has suggested why it would be permissible, in light of the command in § 131.12(a)(2) that water "quality shall be maintained and protected," to fail to conduct Tier 2 review for an existing discharge if that discharge, either

alone or in combination with other discharges, was actually causing continuing significant degradation. If section 5.6.a.2 were interpreted to allow the Secretary of the WVDEP to decline to order Tier 2 review when an existing permitted discharge was causing significant degradation, then section 5.6.a.2 would clearly be inconsistent with § 131.12(a)(2).

charged to the combined receiving waters.

The plaintiffs contend that this provision does not comply with the EPA's regulations, because the exemption from Tier 2 review applies even when the new or expanded discharge results in an increase in individual pollutant parameters, so long as there is a decrease in the overall discharge of pollutants from the facility. The plaintiffs argue that because some pollutants are more harmful than others, allowing an increase in a particularly harmful pollutant to be offset by a reduction in a less harmful pollutant would not ensure that existing water quality is maintained and protected, as required by 40 C.F.R. § 131.12(a)(2). In response, the EPA agrees with the plaintiffs' characterization of § 131.12(a)(2) but contends that section 5.6.c complies with that standard. In its approval letter, the EPA stated that it interprets the phrase "net decrease in the overall pollutant loading" to mean "that there must be a net reduction in the loading for the parameter of concern for this exemption to apply." AR 110. In other words, both the plaintiffs and the EPA agree that a new or expanded discharge from publicly owned wastewater treatment plants cannot be exempted from Tier 2 review if there is a net increase in any individual pollutant parameter. They disagree about whether section 5.6.c reflects this rule.

It is well established that a reviewing court must defer to an agency's reasonable interpretation of the statute the agency is authorized to administer or one of the agency's own regulations. *See Crutchfield v. County of Hanover*, 325 F.3d 211, 218 (4th Cir.2003). Judicial deference to an agency's "reasonable interpretations of

governing law" is based in part on the notion that when "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Judicial deference is also based on an acknowledgment that "the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quotations and citations omitted).

The issue presented here, however, is how this court should review the EPA's interpretation of *West Virginia*'s regulations. There is no dispute between the plaintiffs and the EPA about the meaning of the EPA's regulations; rather, the only dispute is whether West Virginia's procedures satisfy the EPA's agreed-upon standards. Neither party cites any caselaw addressing the proper standard of judicial review in this circumstance, even though it is far from obvious that the traditional deference accorded administrative decisions applies in this circumstance.[21] The EPA's task under the CWA was simply to approve or disapprove West Virginia's antidegradation procedures, depending on whether those procedures were "consistent with" the Act and the EPA's own regulations interpreting that Act. 33 U.S.C. § 1313(c). The court owes judicial deference to the EPA's interpretations of the Act and its own regulations in part because Congress has charged the EPA

---

21. The plaintiffs cite caselaw holding that a reviewing court owes no deference to a State agency's interpretation of a federal statute or regulation. *See Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir.1997); *Ritter v.* *Cecil County Office of Housing*, 33 F.3d 323, 327–28 (4th Cir.1994). The situation here is the reverse, however, so these cases are inapposite.

with administering those laws. But Congress has not charged the EPA with administering West Virginia's antidegradation procedures—that task is left to West Virginia.

That said, judicial deference to agency decisionmaking is not based solely on the fact that the agency is charged with administering the statute or regulation in question. The second justification for judicial deference is that the regulation in question falls within a complex area of particularized agency expertise. This justification still applies in this context. Regardless of whether the EPA is interpreting its own regulations or West Virginia's, antidegradation implementation procedures are undoubtedly a particularized area of law in which the EPA has unique experience and understanding.

While the parties have cited no caselaw outlining the proper standard for this court to use in reviewing the EPA's interpretation of the State's regulations, the court has found two cases that provide some limited guidance. The first case, *Montgomery National Bank v. Clarke*, 882 F.2d 87, 87–88 (3d Cir.1989), involves the Office of the Comptroller of the Currency, a federal agency in charge of approving the expansion of national banks. In *Montgomery National Bank*, the Third Circuit explained that under federal law, the Comptroller is authorized to approve a branch extension of a national bank if, among other things, " 'such establishment [is] authorized to State banks by the law of the State in question.' " *Id.* at 88 (quoting 12 U.S.C. § 36(c) (1982)). Under this statute, "the Comptroller must apply state branching laws when acting upon an application by a national bank to open a branch." *Id.* The plaintiff bank argued that the Comptroller had incorrectly interpreted a New Jersey statute when it approved a competitor bank's application to open a nearby branch. *Id.* at 90–92. The

court rejected the bank's argument, in part because "an agency's reasonable interpretation of a statute that it administers, particularly to the extent that it rests on factual premises within its expertise, is entitled to judicial deference." *Id.* at 91. The court held that "[t]his administrative law doctrine[, which] is usually applied to acts of Congress[,] ... also applies to a state statute that serves as a federal agency's rule of decision." *Id.* at 92. The courts will defer to the federal agency's reasonable interpretation of the state statute, the court held, so long as "the issue raised by the unsettled question of state law falls squarely within the federal agency's field of expertise and the state courts or state agency charged with administering the state statute have not ruled out the interpretation of the statute proffered by the federal agency." *Id.* at 92.

*Montgomery National Bank* is not directly analogous to the case at hand. In *Montgomery National Bank*, the Comptroller was charged by federal statute with interpreting and applying state law in the course of carrying out the Comptroller's own decisions regarding expansions of national banks. At least insofar as the Comptroller was making a decision to approve a branch office, the New Jersey statute was, in a sense, "a statute that [the Comptroller] administers." *Id.* at 91. Here, in contrast, the WVDEP is the agency charged with administering West Virginia's antidegradation procedures. The EPA's role is simply to determine whether those procedures are "consistent with" federal law. Even so, part of the rationale from *Montgomery National Bank* applies to this case, and suggests that the court should defer to the EPA's reasonable interpretation of West Virginia's regulations. As in *Montgomery National Bank*, the State regulations at issue here "fall squarely within the federal agency's field of expertise and the state courts or state agency charged with administering the

[regulations] have not ruled out the interpretation of the [regulations] proffered by the federal agency." *Id.* at 92. In fact, in this case the WVDEP, a defendant-intervenor, has in its briefs explicitly approved of and adopted the EPA's interpretations of West Virginia's antidegradation procedures. *See* WVDEP Op. Br. at 1, 5, 6; Reply Br. at 4, 6, 7. *See also Western State Bank of St. Paul v. Marquette Bank Minneapolis,* 734 F.Supp. 889, 892–93 (D.Minn. 1990) (relying on *Montgomery National Bank* and deferring to federal Comptroller's reasonable interpretation of a Minnesota statute).

The second case on point is *Riverside Cement Co. v. Thomas,* 843 F.2d 1246 (9th Cir.1988). In *Riverside Cement,* a cement company appealed a decision by the EPA interpreting a California regulation regarding permissible nitrogen oxide emission levels from cement kilns. *Id.* at 1247–48. The Ninth Circuit rejected the EPA's interpretation of the California regulation, holding that "EPA may either accept or reject what the state proposes; but EPA may not take a portion of what the state proposes and amend the proposal ad libitum." *Id.* at 1248. The court added that "EPA could not, [unless it decided to promulgate its own rules for the state] . . . take upon itself the primary role Congress assigned to the states." *Id.* The court did not explicitly address whether the EPA's

interpretation of the state regulation was entitled to deference. Instead, the court held that the EPA's interpretation was an impermissible modification of the state regulation.[22] *Id.* One judge dissented, arguing that "[w]hat we have in this case is a difference in interpretation of the state's Rule 1112 which the EPA approved." *Id.* at 1249. Because "EPA's interpretation is reasonable," the dissent argued, that interpretation "is entitled to deference." *Id.* at 1250.

■ It is unclear whether the *Riverside Cement* majority concluded that it owed any deference to the EPA's interpretation of the California rule. It is clear, however, that regardless of the level of deference owed to the EPA's interpretation, the *Riverside Cement* majority found the EPA's interpretation unreasonable. The court called the EPA's interpretation an "amend[ment]" to the regulation rather than a permissible interpretation and stated that the EPA could not "pretend" that the rule meant something other than what the rule said. *Id.* at 1248. Accordingly, both *Montgomery National Bank* and *Riverside Cement* are consistent with the rule that the court should defer to a federal agency's reasonable interpretation of a state regulation, but that the agency is not permitted to effectively amend the regulation to give it a meaning that the text of the regulation does not fairly support.[23]

---

**22.** The regulation in *Riverside Cement* provided that the discharge from a cement kiln could be no more than 3.1 pounds of nitrogen oxides per ton of clinker produced. *Id.* at 1247. The regulation went on to provide, however, that prior to the effective date of this standard, a public hearing would be held to review this limit. *Id.* If the evidence indicated that the 3.1 standard was not supported by evidence, then the emission level would be modified. *Id.* After the State delayed holding the hearing, the EPA interpreted this provision as "setting an absolute limit of 3.1 pounds without regard to the contingency built into the rule." *Id.* The majority de-

scribed the rule, with its public hearing caveat, as "the bureaucratic equivalent of an illusory contract." *Id.*

**23.** Because the WVDEP, not the EPA, is the agency charged with administering these regulations, it might plausibly be argued that the EPA can approve the State's proposed procedures only if *any* reasonable interpretation of those procedures renders them consistent with the Act and the EPA's regulations. Consider a State provision that could reasonably be read in a manner consistent with EPA regulations, and also could reasonably be read in a manner inconsistent with EPA regu-

Despite this court's reservations about judicial deference when the EPA is not the regulatory body charged with administering and enforcing those regulations, the court will defer to the EPA's reasonable interpretations of West Virginia's regulations in light of the EPA's particular knowledge and expertise in this area. The court will not, however, permit the EPA to effectively amend those regulations to mean something other than what the text of the regulation in question fairly supports. With this standard in mind, the court returns to the EPA's approval of section 5.6.c.

Again, section 5.6.c provides that new or expanded discharges from publicly owned water treatment plants are exempt from Tier 2 review "only where there will be a net decrease in the overall pollutant loading discharged to the combined receiving waters." The EPA interprets this provision to mean that there must be a net decrease for each individual pollutant affected by the new or expanded discharge. The court concludes that the text of section 5.6.c does not reasonably support this interpretation, and that the EPA's gloss on section 5.6.c amounts to an impermissible attempt to amend the regulation. The

critical flaw in the EPA's reading of section 5.6.c is that it cannot account for the meaning of the word "overall" in the regulation. If section 5.6.c provided that a wastewater treatment plant may be exempt "only where there will be a net decrease in the pollutant loading," then the regulation would be ambiguous as to whether the net decrease applied to each pollutant or to all pollutants taken together.[24] The term "net decrease" makes clear that the level of pollution must be lower after the new or expanded discharge than it was beforehand. The term "overall," then, can only reasonably mean that the "net decrease" applies to all pollutants considered together—precisely what the plaintiffs and the EPA agree is impermissible. The presence of "overall" before the phrase "pollutant loading" removes any ambiguity regarding whether pollutant loading refers to each individual pollutant, or to all pollutants taken together. While the EPA argues that the terms "pollutant" or "pollutant loading" could reasonably be read to mean an individual pollutant or all pollutants together, neither the EPA nor the intervenors offer any plausible interpretation of the term "overall" that would make that term ambiguous.[25] The court

lations. If the EPA approved such a regulation, the EPA would run the risk that the State, the entity in charge of administering the regulation, would begin applying it in a manner inconsistent with EPA regulations. The EPA, having already approved the regulation, would have no further recourse. Moreover, the State is not bound by the EPA's interpretation of the State's procedures—the EPA's role is limited to approving or disapproving the provisions as written, not amending it. The EPA has no authority to add any legally binding interpretation or modification to. an approved State regulation. Because the State (like the EPA) is free to interpret its own regulations however it wants, so long as its interpretation is reasonable, there would be no legal impediment to the State adopting a reasonable interpretation that was inconsistent with minimum federal requirements.

Nonetheless, for the reasons given above, the court concludes that deference is appropriate in spite of this risk.

24. Alternately, the regulation could be written unambiguously in a manner consistent with EPA regulations: "only where there will be a net decrease in the pollutant loading for each parameter of concern."

25. In fact, it appears that the Municipal Intervenors do not share the EPA's and the WVDEP's interpretation of section 5.6.c. The Municipal Intervenors do not mention the EPA's position, but simply argue that section 5.6.c is permissible because "the State has conditioned the exemption on achieving a net decrease in overall pollutant loads, which demonstrates an environmental benefit ...." Mun. Br. at 9.

concludes that the phrase "net decrease in the overall pollutant loading" unambiguously refers to a net decrease in the loading of all pollutants taken together, and the EPA's contention to the contrary is not a reasonable interpretation of section 5.6.c. Because the EPA agrees that this standard does not satisfy § 131.12(a)(2), the court concludes that the EPA's approval of section 5.6.c was arbitrary and capricious.[26]

### 4. Exempting activities under general section 402 & 404 permits

■ Section 60–5–3.7 of the West Virginia procedures provides that "[r]egulated activities that are granted coverage by a WV/NPDES general permit will not be required to undergo a Tier 2 antidegradation review as part of the permit registration process." In approving this provision, the EPA stated that it interpreted this section "to require that some type of antidegradation review will be completed with the development of a general permit, or proposed reissuance, if the previous general permit had not undergone such a review. However, once the general permit is issued, such an antidegradation review would not be required for each applicant for coverage under the general permit." AR 109. Similarly, section 60–5–3.8 provides that "[r]egulated activities that qualify for coverage under a Corps of Engineers regional or nationwide permit pursuant to section 404 of the Federal [Clean Water] Act that has been certified by the state pursuant to section 401 of the Federal Act will not be required to undergo a Tier 2 antidegradation review, provided, however, that where an individual 401 certification is required, the Secretary [of the WVDEP] may require an appropriate antidegradation review." The plaintiffs contend that EPA regulations do not permit West Virginia to exclude new and expanded uses from individualized Tier 2 antidegradation review simply because those activities are covered by an NPDES or section 404 permit.[27]

**26.** The Municipal Intervenors raise several additional arguments for why section 5.6.c is permissible. First, they argue that the exemptions facilitate the elimination of serious public health risks, such that they would likely satisfy Tier 2 review if such review were required. Section 131.12(a)(2) does not, however, permit a State to bypass Tier 2 review for discharges that would significantly lower water quality simply because the State decides, *ex ante*, that such discharges would probably satisfy Tier 2 review anyway. Instead, all discharges that would significantly lower water quality on a Tier 2 water body must undergo Tier 2 review regardless of how likely it seems that the discharges will satisfy that review. Next, the Municipal Intervenors argue that section 5.6.c is permissible because notwithstanding any exemption from Tier 2, Tier 1 still ensures that existing uses will be protected. This argument is a *non sequitur*. It should go without saying that a State cannot fall short of the requirements of § 131.12(a)(2) simply because it is in compliance with § 131.12(a)(1). Finally, the Municipal Intervenors argue that protections in other West Virginia regulations "work together to ensure a Tier 2–type review despite the exemptions." Mun. Br. at 10. The question here, however, is whether West Virginia's antidegradation implementation procedures satisfy minimum federal requirements, not whether other provisions of West Virginia law somehow make up the failings of those procedures. Moreover, § 131.12(a)(2) requires Tier 2 review in the appropriate circumstances, not "Tier 2–type review." These arguments are therefore without merit.

**27.** The court will assume, for the sake of argument, that the EPA is correct when it asserts that the West Virginia regulations actually require antidegradation review at the general permit stage. In fact, it is not at all clear that West Virginia's regulations require *any* antidegradation review for general permits. Section 3.7 provides that "new and reissued WV/NPDES general permits will be evaluated to consider the potential for significant degradation as a result of the permitted activity. Regulated activities that are granted coverage by a WV/NPDES general permit will not be required to undergo a Tier 2 antidegradation review as part of the permit registration process." While section 3.7 states that new and reissued general permits "will be

The plaintiffs' objections relate to general permits issued under two sections of the Clean Water Act: section 402, 33 U.S.C. § 1342, and section 404, 33 U.S.C. § 1344. A brief discussion of these sections and their permitting processes is necessary in order to put the plaintiffs' objections in context. Section 402 of the Clean Water Act establishes the National Pollutant Discharge Elimination System (NPDES). *See* 33 U.S.C. § 1342. Generally speaking, section 402 authorizes the EPA to issue, "after opportunity for public hearing, . . . a permit for the discharge of any pollutant upon condition that the discharger meet the applicable 'best technology' effluent requirements." William H. Rodgers, Jr., *Environmental Law* § 4.26 (1991) [hereinafter Rogers, *Environmental Law*]. Section 402(b) provides a mechanism whereby states can take over the NPDES permit program from the EPA, provided that the State program meets minimum federal standards. *See* 33 U.S.C. § 1344(b). West Virginia administers its own NPDES permit program.

The EPA has interpreted section 402 to allow for the issuance of general NPDES permits. *See* 40 C.F.R. § 122.28. A general permit is a single NPDES permit that covers a number of individual discharges that would otherwise require individual NPDES permits. *See id.* General permits may be issued for, among other things, facilities that involve the same or similar operations, that discharge the same types of waste, or that require the same or similar type of monitoring. *See id.* General permits may cover a specified geographical area, which can be as large as an entire state. *See id.* Significantly, general permits can cover not only a specified class of existing discharges, but also new discharges in the future that fall within the class. When an individual seeks to engage in an activity of the type covered by a general permit, that individual simply applies for coverage under the general permit by filing a written "notice of intent" rather than applying for an individual permit. *See* 40 C.F.R. § 122.28(b)(2)(i). The benefit of the general permit process for individual dischargers is that approval is substantially quicker and less expensive than applying for an individual NPDES permit. On the other hand, there is a danger that the general permit process could be used to circumvent entirely the individualized assessments contemplated by the individualized permit system.[28]

Section 404 of the Act carves out for special treatment a particular type of water pollution. In section 404, Congress singled out "the discharge of dredged or fill materials into navigable waters" and gave the Army Corps of Engineers the

evaluated to consider the potential for significant degradation," that section nowhere states that if significant degradation will result, Tier 2 review shall be applied. Thus, nothing in the regulations makes it clear that Tier 2 review need ever be applied to general NPDES permits. Section 3.8, governing section 404 regional or general permits, does not even contain the requirement that these permits be evaluated for the potential of significant degradation. Instead, section 3.8 simply provides that activities covered by a section 404 regional or nationwide permit are exempted from Tier 2 antidegradation review.

Thus, the court is skeptical of the EPA's claim that sections 3.7 and 3.8 require *any*

antidegradation review for activities covered by NPDES or section 404 permits. Nonetheless, because the plaintiffs do not press the point, the court will assume for present purposes that these sections do require antidegradation review at the time the general permit is issued.

**28.** As one commentator put it: "There is something about a nationwide permit, like a mass conversion or a universal truth, that sounds extravagant and presumptuous; would you recommend a single dog license for all the mongrels in the state?" Rodgers, *Environmental Law* § 4.12.

authority to issue permits for this type of discharge. 33 U.S.C. § 1344. *See also* Rodgers, *Environmental Law* § 4.12. In 1977, Congress amended the Act to permit the issuance of "general permits." 33 U.S.C. § 1344(e); Rodgers, *Environmental Law* § 4.12. Under section 404(e), the Corps may:

after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.

33 U.S.C. § 1344(e). As with general permits under section 402, individuals discharging the type of pollutant covered by a general section 404 permit need not apply for an individual section 404 permit, but may seek coverage under an existing nationwide or regional section 404 permit. *See* 33 C.F.R. § 330.1.

The plaintiffs argue that EPA regulations do not permit Tier 2 antidegradation review to occur only at the time a general section 402 or section 404 permit is issued, but instead require antidegradation review for each individual use covered by such a general permit. The plaintiffs point to an EPA statement in its 1998 ANPRM that:

It is the position of EPA that, at a minimum, States ... must apply antidegradation requirements to activities that are "regulated" under State ... or federal law (i.e., any activity that requires a permit or a water quality certification pursuant to State ... or federal law, such as CWA § 402 NPDES permits or CWA § 404 dredge and fill permits ....).

63 Fed.Reg. 36,7432, 36,780; AR 553. According to the plaintiffs, this statement means that any activity requiring a section 402 or section 404 permit must, on an individualized basis, be subjected to antidegradation review. In response, the EPA argues that conducting Tier 2 review at the general permit stage is consistent with its prior statement. According to the EPA, the fact that "States ... must apply antidegradation requirements to ... any activity that requires a ... CWA § 402 NPDES permit[ ] or CWA § 404 dredge and fill permit[ ]," *id.*, does not mean that antidegradation review cannot be done at the general permit stage. The court agrees with the EPA that this statement can reasonably be read to permit antidegradation review of a general permit rather than review of each individual use under that permit.

The plaintiffs seek further support for their position by pointing to EPA actions in similar contexts. For example, in November of 2000 the EPA issued a general NPDES permit for water treatment facilities in Massachusetts and New Hampshire. *See* Final NPDES General Permits for Water Treatment Facility Discharges in the States of Massachusetts and New Hampshire, 65 Fed.Reg. 69,000 (November 15, 2003). The EPA explained that the general permit "does not apply to any new or increased discharge to other waters unless the discharge is shown to be consistent with the state's antidegradation policies." 65 Fed.Reg. 69,000, 69,003. In particular, "EPA will not authorize these discharges under the general permit until it receives a favorable antidegradation review and certification from the States." *Id.* Thus, contrary to its approach here, the EPA required each additional new or expanded use seeking coverage under the general permit first to undergo individualized antidegradation review.

Similarly, in September of 2000 the EPA issued a general permit for storm water

discharges from industrial facilities. *See* Final Reissuance of National Pollutant Discharge Elimination System (NPDES) Storm Water Multi–Sector General Permit for Industrial Activities, 65 Fed.Reg. 64,-746 (Oct. 30, 2000). This general permit covers most areas of the United States where the NPDES program has not been delegated to the States. 65 Fed.Reg. 64,-746, 64,746. As part of this general permit, the EPA addressed an objection by a commenter concerned with how Tier 2 review would be conducted in relation to activities under the permit. The EPA responded as follows:

> The commenter correctly recognizes the difficulty in determining what defines "necessary to accommodate important economic or social development" in accordance with 40 CFR Section 131.12(a)(2). By statute, this determination involves public participation, the assurance that water quality will be protected, and several other factors. EPA would have to modify the permit for each discharge in question in order to comply with 40 CFR Section 131.12(a)(2). Individual considerations such as these are contrary to the concept of a general permit. In addition, public participation would be impossible since the permit issuing authority would not know about the particular discharge to tier 2 waters before a NOI [notice of intent] was submitted. Therefore, a facility operator must seek coverage under an individual permit to discharge to tier 2 waters under 40 CFR Section 131.12(a)(2)'s allowable degradation provisions to satisfy the requirements for public participation and protection of water quality. The only discharges allowed coverage under today's permit are those which do not degrade the use of a tier 2 water below its existing levels, even though those existing levels exceed levels necessary to support propagation

of fish, shellfish and wildlife and recreation in and on the water.

65 Fed.Reg. 64,746, 64,793–94. In this passage, the plaintiffs argue, the EPA clearly states the reasons why Tier 2 antidegradation review cannot be performed on a general permit-wide basis, but must be performed on each individual discharge under a general permit.

The EPA argues that its statements regarding these other general permits are inapposite. The September 2000 storm water permit, the EPA argues, covered discharges from many industrial facilities in numerous states, such that the EPA could not make a blanket antidegradation determination for so many discharges in such a large area. The court does not find this distinction persuasive. General statewide NPDES permits also cover many separate discharges from different facilities in a large and varied geographical area—the entire state of West Virginia. General section 404 permits cover many separate discharges over even larger areas, such as the entire nation. The EPA does not explain why the difficulties that were present in making blanket antidegradation determinations for these general permits are not also present for general permits in West Virginia.

In the alternative, the EPA argues that either approach is a permissible interpretation of EPA regulations. That is, while it was a reasonable interpretation of EPA regulations for the EPA to require antidegradation review on an individualized basis, it is also reasonable simply to require antidegradation review on a general permit-wide basis. This argument has more force. Inherent in the notion of an agency's discretion to interpret its own regulations is the idea that an agency may adopt any one of various reasonable interpretations of that regulation. An agency's prior choice of one reasonable interpreta-

tion does not preclude the agency from reconsidering its position in light of its ongoing experience and accumulated knowledge and adopting another reasonable interpretation. *See Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). That said, the EPA's interpretation of its regulations must still be a reasonable one.

As noted above, in regards to its September 2000 storm water general permit, the EPA stated that "[i]ndividual considerations [required for Tier 2 review] such as [evaluating economic or social development in the area in which a water body is located] are contrary to the concept of a general permit." 65 Fed.Reg. 64,746, 64,794. The EPA also explained that "public participation [as required by section 131.12(a)(2) ] would be *impossible* since the permit issuing authority would not know about the particular discharge to tier 2 waters before a NOI was submitted." *Id.* (emphasis added). The EPA offers no explanation for why these same objections are not equally applicable to West Virginia's procedures here. Under § 131.12(a)(2), water quality cannot be lowered unless doing so is "necessary to accommodate important economic or social development in the area in which the waters are located." This standard, by its terms, is location-specific. When a general permit is issued under section 402 or section 404, the State simply does not know the specific locations of discharges that might be covered by the general permit; discharge locations are not known until individuals seek permission to discharge under the general permit. In light of this fact, the court does not understand how the State could determine, at the time the general permit is issued, that each potential discharge that might some day be covered by the general permit is "necessary to accommodate important economic or social development *in the area in which the waters are located.*" § 131.12(a)(2) (empha-

sis added). The EPA has not explained how, before the fact, the State could determine whether a given discharge was associated with "important" economic or social development or whether, in the particular area in which the affected waters are located, lowering water quality was "necessary" for such development. Nor has the EPA explained how the State could hold a meaningful public participation process regarding potential degradation of the State's waters prior to the time when members of the public were aware of the nature and location of specific discharges covered by the permit—something the EPA previously deemed "impossible."

■ The EPA argues that it has frequently promulgated complex rules under the Clean Water Act and other statutes, such as the National Toxics Rule, that are applicable in large geographical areas. *See* 57 Fed.Reg. 60848 (Dec. 22, 1992). The EPA argues that in many of these cases, the analyses, determinations, and assurances required are just as complex as those that would be required for Tier 2 antidegradation review of general permits. The EPA also notes that it has issued general permits, such as its General Permit for Eastern Gulf of Mexico, that cover large geographical areas and take into account many site-specific factors. *See* 63 Fed.Reg. 55718 (Oct. 16, 1998). The court has no reason to doubt that complex environmental regulation can be done (and has been done) on a large geographical basis, taking into account various local concerns. The court's focus here, however, is whether the specific type of review called for in § 131.12(a)(2) can be done on a general level. On that particular question, the EPA has not explained how "determining what defines 'necessary to accommodate important economic or social development' ... [which] involves public participation, the assurance that water quality will be

protected, and several other factors," can be done at the general permit stage. 65 Fed.Reg. 64,746, 64793. Nor has the EPA explained why it is not true here, as it was for its September 2000 storm water discharge general permit, that "public participation would be impossible since the permit issuing authority would not know about the particular discharge to tier 2 waters before a NOI was submitted." 65 Fed.Reg. 64,746, 64794. The court is not implying that once the EPA has interpreted its regulation in one manner, it can never reconsider the matter and adopt another, equally reasonable interpretation of that regulation. On the contrary, "a[n agency's] revised interpretation deserves deference because '[a]n initial agency interpretation is not instantly carved in stone.'" *Rust,* 500 U.S. at 186, 111 S.Ct. 1759 (quoting *Chevron,* 467 U.S. at 863, 104 S.Ct. 2778). Nonetheless, there is "'at least a presumption that [an agency's] policies will be carried out best if the settled rule is adhered to.'" *Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Atchison, Topeka & Sante Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973)). As such, an agency must "justif[y][its] change of interpretation with a 'reasoned analysis'" for that change. *Rust,* 500 U.S. at 187, 111 S.Ct. 1759 (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 42, 103 S.Ct. 2856).

While this court is mindful of the deference it owes to the EPA's reasonable interpretations of its own regulations, the EPA has not explained how the type of review called for in § 131.12(a)(2), which is location-specific and requires public participation, can be done on a statewide or nationwide basis. The EPA's statements in relation to the September 2000 storm water discharge general permit do not pertain to how the language of § 131.12(a)(2)

can reasonably be interpreted. Rather, those statements pertain to whether, as a practical matter, it is possible to conduct Tier 2 review when a general permit is issued, prior to the identification and evaluation of specific discharges into specific waters. In September of 2000 the EPA stated that such review was not possible. The EPA has not explained how circumstances have changed to render such review possible today. Based on the current record, the EPA has failed to offer a reasoned analysis, or a reasonable factual basis, to justify the change in its opinion that Tier 2 antidegradation review could not feasibly be performed at the general permitting stage. Accordingly, the court concludes that the EPA's approval of section 60–5–3.7, which does not require Tier 2 antidegradation review for discharges under a general section 402 or section 404 permit, except (arguably) at the time the general permit is issued, was arbitrary and capricious.

**5. Allowing the degradation of Tier 2 waters from point sources after Tier 2 review so long as best management practices for nonpoint sources are installed and maintained**

The plaintiffs next object to the treatment of nonpoint sources in the West Virginia regulations. The Act defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A "nonpoint source," in contrast, is "unchanneled and uncollected surface runoff." *Shanty Town Assocs. Ltd. P'ship v. EPA,* 843 F.2d 782, 785 n. 2 (4th Cir.1988). In the Clean Water Act, "Congress consciously distinguished between point source and

nonpoint source discharges, giving EPA authority under the Act to regulate only the former." *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir.1976). All parties agree, then, that the EPA has no authority under the CWA to regulate nonpoint sources directly. That fact notwithstanding, EPA regulations indirectly place certain limits on nonpoint source pollution. Under Tier 2, water quality may be lowered after a process of public participation and a determination that allowing lower water quality is necessary for important economic or social development. Even when this is the case, however, there are additional conditions that must be met before water quality in a Tier 2 water may be lowered. Among other things, "the State shall assure that there shall be achieved ... all cost-effective and reasonable best management practices for nonpoint source control." 40 C.F.R. § 131.12(a)(2). Thus, States are not required to regulate nonpoint source control, but if a State does not assure that best management practices are achieved for nonpoint source control, the State cannot permit the lowering of water quality from point sources on any Tier 2 water, economic or social necessity notwithstanding.

Nonpoint source control is addressed in section 60–5–1.5.b of the West Virginia regulations. Under section 1.5.b, "[n]onpoint source activities will be deemed to be in compliance with antidegradation requirements with the installation and maintenance of cost-effective and reasonable best management practices ...." The plaintiffs argue that this rule is inconsistent with EPA regulations because nonpoint source activities are deemed to be in compliance so long as best management practices are *installed and maintained,* whereas the EPA's regulation requires that the State *assure* that best management practices be *achieved.* In response, the EPA argues that it was reasonable for it to conclude that requiring the installa-

tion and maintenance of best management practices satisfies the standard that best management practices be achieved. The court agrees. In common parlance, saying that certain practices must be "installed and maintained" is roughly equivalent to saying that those practices must be "achieved." The plaintiffs have not explained why, in the context of best management practices for nonpoint source control, there is any significant gap between these two notions. Accordingly, it was reasonable for the EPA to conclude that if best management practices are installed and maintained, then best management practices will be achieved.

**6. Discretion afforded WVDEP to exempt "types or classes of activities" from Tier 2 review**

■ Section 60–5–5.6.c provides that "[t]he Secretary [of the WVDEP] may determine that certain types or classes of activities should be exempt from Tier 2 review after balancing the relative impact of the activities on water quality against the overall benefit of the activities to public health and welfare or the environment." The plaintiffs contend that this provision is flatly inconsistent with EPA regulations, which do not provide for blanket exemptions for classes of activities that may impact water quality. In its approval of this provision, the EPA clarified that "any such exemptions are subject to EPA review under Section 303(c) of the Clean Water Act prior to being implemented." AR 110. Accordingly, the EPA argues that section 5.6.c simply preserves West Virginia's right to amend its antidegradation rules, subject to EPA approval, which is a power afforded West Virginia under the Clean Water Act regardless of whether section 5.6.c appears in West Virginia's antidegradation procedures or not. According to the EPA, "[s]ection 5.6.c merely serves as a notice and reservation of West Virginia's

ability to act [under section 303(c) of the Clean Water Act] but does not give West Virginia any additional authority." EPA Op. Br. at 30.

The question, then, is whether it is reasonable for the EPA to interpret section 5.6.c as nothing more than a State codification of the procedures for revising water quality standards already available under section 303(c) of the Act. The first obvious problem with section 5.6.c is that it nowhere makes reference to EPA approval of a new exemption. The provision does not require the Secretary to submit any proposed exemption to the EPA or condition the validity of any proposed exemption on EPA approval. If section 5.6.c were simply a restatement of West Virginia's pre-existing rights to revise its water quality standards under section 303(c), it would have to contain some reference to EPA approval. While the EPA stated in its approval letter that "any such exemptions are subject to EPA review under Section 303(c) of the CWA," the EPA does not explain why this statement in its approval letter has any legal force.

In addition, the procedures set out in section 5.6.c for the Secretary to issue an exemption do not satisfy the procedures required by section 303(c) for a State to revise a water quality standard. Under section 5.6.c, "[w]here the agency tentatively determines to grant an exemption under this provision, notice of this determination must be included in any required public notice, such as public notice required prior to issuance of an NPDES permit. The Secretary's final determination is a final decision and subject to appeal to the Environmental Quality Board." Section 303(c) of the Clean Water Act provides that "the State water pollution control agency of [a] State shall from time to time (but at least once [every] three year[s] . . .) hold public hearings for the purpose of reviewing applicable water quality standards and, as appropriate, modifying and adopting standards. Results of such review shall be made available to the Administrator." 33 U.S.C. § 1313(c)(1). In addition, "[w]henever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator." *Id.* at § 1313(c)(2)(A). The EPA Administrator then has sixty days to approve the standard or ninety days to disapprove it. *Id.* at § 1313(c)(3).

While section 5.6.c provides for public notice, it does not provide for "public hearings," as required by section 303(c), prior to the Secretary's adoption of the new standard. Furthermore, public notice of a possible new exception need only "be included in any *required* public notice." Section 5.6.c (emphasis added). That is, public notice of a new exception to Tier 2 review is required only when public notice is otherwise required for the agency's action. Under this standard, the Secretary need not give any public notice of a new exception to Tier 2 review unless that exception was granted as part of an action otherwise requiring public notice. Finally, section 303(c) provides that "[w]henever a State reviews water quality standards pursuant to paragraph (1) of this subsection, or revises or adopts new standards pursuant to this paragraph, such State shall adopt criteria for all toxic pollutants listed pursuant to section 1317(a)(1) of this Act for which criteria have been published under section 1314(a) of this title, the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses." 33 U.S.C. § 1313(c)(2)(B). Contrary to the CWA, section 5.6.c does not require the Secretary to adopt criteria for toxic pollutants

identified by the EPA in the course of granting new exceptions to Tier 2 review.[29]

In light of the fact that section 5.6.c does not require the Secretary to submit any new exceptions to the EPA for approval, and the fact that the procedures required by section 5.6.c for promulgating a new exception do not satisfy the procedures required by section 303(c) for revising water quality standards, the court concludes that the EPA's position that section 5.6.c does not afford the State any new powers not already granted under section 303(c) is unreasonable and contrary to the plain meaning of section 5.6.c. Accordingly, the EPA's approval of section 5.6.c was arbitrary and capricious.

### 7. Standards used for establishing when Tier 2 review is required

#### (a) Section 60–5–5.2

■ Section 60–5–5.2 provides that "[w]ater segments that support the minimum fishable/swimmable uses and have assimilative capacity remaining for some parameters shall generally be afforded Tier 2 protection." The plaintiffs argue that the word "generally" renders this provision inconsistent with EPA regulations, which require Tier 2 protection in *all* cases where the water segment supports minimum fishable/swimmable uses and has assimilative capacity remaining for some parameters.

The EPA responds by stating that it understands the word "generally" to mean that all such waters shall be given Tier 2 protection "except as otherwise specifically provided in West Virginia's implementation procedures." EPA Op. Br. at 34. Except as specified elsewhere, the EPA states, the term "generally" does not mean that WVDEP may exclude waters meeting

this standard. As an example of a West Virginia regulation that does "provide otherwise," the EPA cites section 60–5–5.4. Under section 5.4, where there is insufficient evidence to classify a water body, a regulated entity may seek a Tier 1 designation by submitting water quality data showing that "there is no remaining assimilative capacity for any parameter to be affected by [the entity's] activity."

The court does not understand, however, why this example illustrates the need for the word "generally." According to the EPA, the word "generally" simply means that "[w]ater segments that support the minimum fishable/swimmable uses and have assimilative capacity remaining for some parameters" shall be afforded Tier 2 protection, except when another section of the implementation procedures provides otherwise. Section 5.4, however, does not "provide otherwise." Section 5.4 permits a regulated entity to seek a Tier 1 designation by submitting data that the water body has no remaining assimilative capacity for those parameters that will be affected. Thus, when a regulated entity satisfies section 5.4 by submitting data showing that the water body lacks remaining assimilative capacity, the regulated entity has simply demonstrated that the water body is *not* a "[w]ater segment[ ] that support[s] the minimum fishable/swimmable uses and ha[s] assimilative capacity remaining for some parameters." That is to say, when the requirements of section 5.4 are met, the water body in question no longer meets the terms of section 5.2, and no exception to section 5.2's general terms is necessary. According to the EPA, the term "generally" is needed only to make clear that activities that would otherwise fall within the ambit of section 5.2 are

---

**29.** The failure of section 5.6.c to require EPA approval is all the more striking in light of the fact that section 5.6.c does set out the procedures for adopting a new exception to Tier 2 review, but does not mention EPA approval in those procedures.

excluded if they are exempted by another provision. But waters classified as Tier 1 under section 5.4 would not otherwise fall within the ambit of section 5.2.

Section 5.2 itself also purports to contain an example of a water body that meets the general terms of section 5.2 but is otherwise excluded. Section 5.2 states, "[f]or example, a water segment listed on the state's 303(d) impaired waters list can qualify for Tier 2 protection, but where the impairment ... results in failure to attain minimum uses, that water segment will be afforded only Tier 1 protection." Again, this example does not illustrate any need for the word "generally." Even when a water body has only one impairment, if that impairment results in a failure to attain minimum uses, then that water body does not "support the minimum fishable/swimmable uses and have assimilative capacity remaining for some parameters." Like a water body covered by section 5.4, the type of water described in this part of section 5.2 would not otherwise fall within the ambit of section 5.2's general definition of a Tier 2 water body. Accordingly, there is no need to qualify that general definition with the term "generally."

The parties have not identified, and this court has not discovered, any other provisions of West Virginia's antidegradation implementation procedures that exempt from Tier 2 protection a water body that supports minimum fishable/swimmable uses and has remaining assimilative capacity for some parameters. Accordingly, the court concludes that the EPA's explanation of the meaning of the word "generally" in section 5.2 is not a reasonable interpretation of that provision. As such, the EPA's approval of section 5.2 was arbitrary and capricious.

### (b) Section 60–5–5.3

■ Section 60–5–5.3 provides that [w]here a water segment does not meet or exceed applicable water quality criteria for every parameter, the Secretary will determine whether the water segment will be afforded Tier 2 protection as part of the antidegradation review process using best professional judgment. In addition to data available for review, the Secretary may consider factors such as (1) existing aquatic life uses, (2) existing recreational or aesthetic uses, (3) existing water quality data for upstream segments or comparable segments, (4) biological score for the water segment, and (5) the overall value of the segment from an ecological, health and public use perspective.

This provision, the plaintiffs argue, is also inconsistent with EPA regulations because it gives the WVDEP discretion to deny Tier 2 protection to any water body if any single parameter violates water quality standards, even if that water body supports fishable/swimmable uses and its other parameters meet or exceed levels necessary to support those uses. In particular, the plaintiffs note that the EPA previously expressed its disapproval of a proposed provision that "if any parameter exceeds water quality standards," then the water body is automatically designated as Tier 1. The plaintiffs argue that the current provision, which states that the WVDEP shall make a discretionary designation where any water does not meet or exceed levels necessary to support designated uses for all criteria, is simply a restatement of this previously-rejected approach.

The EPA argues that this provision merely reflects the water body-by-water body approach to Tier 2 classifications. The water body-by-water body approach, the EPA notes, depends on an overall evaluation of the water body in light of a number of factors. Accordingly, the EPA argues, West Virginia's regulations may permit the WVDEP discretion in deter-

mining whether a water body that has assimilative capacity for some parameters is, overall, a high quality water body. The court agrees with the EPA that section 5.3 is not simply a restatement of the previously-rejected rule that if a water body exceeded relevant levels for any one parameter, that water body is automatically designated as Tier 1. Section 5.3 contains no similar provision for automatic designation as Tier 1 or Tier 2. When a water body does not meet at least one criteria, the Secretary then makes a case-by-case determination of whether that water body is, overall, a high quality water body. For example, even when a given water body exceeds water quality standards for many criteria, if that water body has high levels of one or two pollutants that prevent the stream from supporting aquatic life, it may well be reasonable to determine that the water body is not, overall, a high quality water. This feature distinguishes the water body-by-water body approach from the pollutant-by-pollutant approach: certain water bodies that are not overall of high quality will not be afforded Tier 2 protection for *any* parameter, even though *some* parameters do exceed levels necessary to support minimum uses.

While the plaintiffs' discussion of section 5.3 is contained in the same section as its discussion of section 5.2, the court finds those objections better taken as against section 5.2 than section 5.3. The court has already agreed with the plaintiffs that EPA regulations require that "[w]ater segments that support the minimum fishable/swimmable uses *and* have assimilative capacity remaining for some parameters *shall . . . be afforded* Tier 2 protection," section 5.2 (emphasis added), and that West Virginia's caveat that such protection shall only "generally" be afforded is not permissible. But when these two conditions are not met—when the water segment either does not support the minimum fishable/swimmable uses, or when the water segment does not have assimilative capacity remaining for some parameters—then it is consistent with the EPA's regulations to permit the WVDEP the discretion to determine whether such waters are overall of a high quality or not. Accordingly, the court concludes that the EPA's approval of section 5.3 was reasonable, not arbitrary or capricious.

### 8. Tier 2 *De Minimis* Standard

■ Section 60–5–5.6.a.1 states that Tier 2 antidegradation review is required for activities on Tier 2 waters "that would significantly degrade water quality." Section 5.6.d clarifies that "[d]egradation for Tier 2 shall be deemed significant if the activity results in a reduction in the water segment's available assimilative capacity (the difference between the baseline water quality and the water quality criteria) of ten percent or more . . . for parameters of concern." In addition, "[d]egradation will also be deemed significant if the proposed activity, together with all other activities allowed after the baseline water quality is established, results in a reduction of the water segment's available assimilative capacity of 20% or more . . . for the parameters of concern." The plaintiffs contend that these provisions, establishing a percentage reduction of assimilative capacity that will not trigger Tier 2 review, are inconsistent with EPA regulations.

According to the plaintiffs, Tier 2 simply does not allow "lower water quality" without a public hearing and finding of economic or social necessity. The EPA responds that its regulations do not specifically define "lower water quality." Moreover, the EPA argues, in the absence of statutory or regulatory language to the contrary, courts have generally held that an administrative agency has inherent authority to make *de minimis* exceptions to statutory or regulatory standards. In

*Alabama Power Co. v. Costle,* 636 F.2d 323 (D.C.Cir.1979), the D.C. Circuit held that "exemptions may ... be permissible as an exercise of agency power, inherent in most statutory schemes, to overlook circumstances that in context may fairly be considered de minimis." *Id.* at 360. *See also Ober v. Whitman,* 243 F.3d 1190, 1193–95 (9th Cir.2001) (holding that even though the Clean Air Act "makes no explicit provision for a 'de minimis' exception," the EPA had the discretion to "exempt de minimis sources of PM–10 from pollution controls."); *Environmental Defense Fund, Inc. v. EPA,* 82 F.3d 451, 466–67 (D.C.Cir.1996) (endorsing *de minimis* exceptions in the absence of express statutory language to the contrary). A noted commentator summarized the caselaw with the following "default rule" for agency authority to craft *de minimis* rules: "Unless Congress has clearly said otherwise, agencies will be permitted to make *de minimis* exceptions to statutory requirements by exempting small risks from regulatory controls." Cass R. Sunstein, *Cost–Benefit Default Principles,* 99 Mich. L.Rev. 1651, 1668 (2001).

The first question, then, is whether the EPA's regulation rules out the possibility of a *de minimis* lowering of water quality. The plaintiffs cite several cases where courts held that no *de minimis* exceptions were permissible. *See, e.g., Natural Resources Defense Council, Inc. v. EPA,* 824 F.2d 1211, 1216 (D.C.Cir.1987); *North Carolina v. FERC,* 112 F.3d 1175, 1186 (D.C.Cir.1997). The statutory or regulatory provisions in these cases, however, are distinguishable from the language of § 131.12(a)(2). For example, in *NRDC* the court considered the EPA's interpretation of the Drinking Water Act. The Act "directs the Administrator to establish a recommended level for 'each contaminant which, in his judgment ... *may have any* adverse effect on the health of persons.'" *NRDC,* 824 F.2d at 1216 (quoting 42

U.S.C. § 300g–1(b)(1)(B)) (emphasis in *NRDC*). Industry groups argued that this language compelled the the EPA to make a finding of significant risk to human health prior to regulating a particular contaminant. *Id.* at 1215. The court disagreed, noting that the language "may have any adverse effect" was "inconsistent with a requirement that the Administrator make a threshold finding of significant risk; a contaminant may have some adverse effect on the health of persons without posing a significant risk to human health." *Id.* at 1216. Similarly, the D.C. Circuit recently expressed "serious reservations concerning FERC's attempt to redefine the statutory phrase '*any* discharge,' 33 U.S.C. § 1341(a)(1), to mean only those discharges that are 'material,' 18 C.F.R. § 4.38(f)(7)(iii)." *North Carolina,* 112 F.3d at 1186 (emphasis added). In this case, § 131.12(a)(2) does not require Tier 2 prior to "allowing *any* lowering of water quality." Rather, § 131.12(a)(2) requires Tier 2 review prior to "allowing lower water quality." Elsewhere the regulation speaks in terms of "degradation or lower water quality," but does not say "*any* degradation or *any* lower water quality."

In *Alabama Power,* the court provided further explanation of the nature of a permissible *de minimis* exception: "[t]he ability, which we describe here, to exempt *de minimis* situations from a statutory command is not an ability to depart from the statute, but rather a tool to be used in implementing the legislative design." 636 F.2d at 360. In particular, "there is likely a basis for an implication of *de minimis* authority to provide exemption when the burdens of regulation yield a gain of trivial or no value. That implied authority is not available for a situation where the regulatory function does provide benefits, in the sense of furthering the regulatory objectives, but the agency concludes that the

acknowledged benefits are exceeded by the costs." *Id.* at 360–61. In this case, nothing in the EPA's regulation prohibits a *de minimis* exception from Tier 2 review when water quality is lowered only a "trivial" amount. Indeed, the EPA has previously stated that some *de minimis* amount of degradation may be permitted without triggering Tier 2 review. In its 1998 ANPRM, the EPA stated that "[w]here the degradation is not significant, the antidegradation review is typically terminated for that proposed activity," and that "[a]pplying antidegradation requirements only to activities that will result in significant degradation is a useful approach that allows States ... to focus limited resources where they may result in the greatest environmental protection." 63 Fed.Reg. 36,742, 36,783; AR 556. The court concludes that the EPA's regulation does not preclude a State from permitting some *de minimis* amount of pollution prior to imposing Tier 2 review.

In the alternative, the plaintiffs argue that even if some *de minimis* exception is permissible, the specific levels approved by the EPA in this case—ten percent reduction in assimilative capacity for a single source and twenty percent reduction in assimilative capacity for cumulative sources—are not permissible because the levels are not justified by any evidence in the record. The D.C. Circuit in *Alabama Power* stated that "[d]etermination of when matters are truly *de minimis* naturally will turn on the assessment of particular circumstances, and the agency will bear the burden of making the required showing." 636 F.2d at 360. In the 1998 ANPRM, the EPA cautioned against States using "a high threshold of significance," which could "unduly restrict[ ] the

number of proposed activities that are subject to a full antidegradation review." 63 Fed.Reg. 36,742, 36,783; AR 556. The EPA also warned against procedures that do "not adequately prevent cumulative water quality degradation." *Id.*[30]

In support of the Tier 2 *de minimis* levels in the West Virginia implementation procedures, the EPA cites its Water Quality Guidance for the Great Lakes System: Supplementary Information Document (Great Lakes SID). In the Great Lakes SID, issued in March of 1995, the EPA addressed *de minimis* degradation in the Great Lakes Ecosystem. The EPA provided that States could categorize as *de minimis* any discharge of non-bioaccumulative chemicals of concern (non-BCCs) that took up "less than 10 percent of the available assimilative capacity." Great Lakes SID at 207; AR 460. The EPA justified the *de minimis* provision by stating that:

> Although de minimis provisions do involve non-conservative assumptions, the de minimis provisions included in the proposed Guidance are not likely to seriously undermine the protection afforded a high quality water body through antidegradation. De minimus provisions provide a means for States ... to differentiate between actions that will result in an increased loading of a pollutant to a receiving water that is likely to have a significant impact on water quality and those that are unlikely to do so and focus review efforts on actions that will degrade water quality. It is reasonable to assume that loading increases of non-BCCs that will use less than ten percent of the remaining assimilative capacity in a water body will have a negligible effect on ambient water quality.

---

**30.** The EPA stated that "[t]he current regulation does not specify a significance threshold," and that "a clear national norm regarding this 'significance test' is necessary and should be developed and established either in the regulation or national guidance." *Id.* Despite this statement, the EPA apparently has not yet established any such national norm.

Great Lakes SID at 208; AR 461. The plaintiffs point out that West Virginia's *de minimis* provision applies to all pollutants, including BCCs, which were specifically exempted by the EPA in the Great Lakes SID. In fact, in that document the EPA rejected the argument that the *de minimis* provisions should include BCCs, stating that:

> EPA does not agree that even small increases in the loadings of BCCs to the Great Lakes Basin can be considered de minimis. Low levels of BCCs in the Great Lakes have adverse impacts on the organisms that inhabit them. Further, because BCCs are both resistant to degradation and hydrophobic, they tend to accumulate in sediments and biota, amplifying their effects. For these reasons, even small increases in loadings of this type of pollutant must be considered significant.

Great Lakes SID at 208–09; AR 461–62. In light of this document, the plaintiffs argue, it is at the very least impermissible for West Virginia to include BCCs in its ten percent/twenty percent *de minimis* provision.

The EPA responds that the term "BCCs" was created during the Great Lakes Initiative to categorize pollutants that are particularly harmful to the Great Lakes ecosystem. This determination, the EPA argues, depended on the unique nature of that ecosystem, which is quite different than that found in West Virginia. The record supports the EPA's contention in this regard. In the Final Water Quality Guidance for the Great Lakes System, the EPA explained that "[t]he final Guidance ... reflects the unique nature of the Great Lakes Basin Ecosystem ...." Final Water Quality Guidance for the Great Lakes System, 60 Fed.Reg. 15,366, 15,369 (March 23,

1995); AR 393. For example, "[t]he internal responses and processes that operate in the Great Lakes because of their depth and long hydraulic residence times cause pollutants to recycle between biota, sediments and the water column." 60 Fed. Reg. 15,366, 15,367; AR 391. Given "the physical, chemical and biological characteristics of the Great Lakes," the EPA "devoted considerable effort to indentifying the chemicals of most concern to the Great Lakes System—persistent, bioaccumulative pollutants termed 'bioaccumulative chemicals of concern (BCCs)'—and developing the most appropriate criteria, methodologies, policies, and procedures to address them." 60 Fed.Reg. 15,366, 15,369; AR 393. This document supports the EPA's position that pollutants classified as BCCs in the Great Lakes Guidance posed a particular danger to the Great Lakes in light of that ecosystem's unique characteristics, which are not present in West Virginia's waterways.

In light of all this, the court defers to the EPA's conclusion, which the court finds reasonable in light of the evidence in the record, that its regulations allow West Virginia to include a *de minimis* provision of up to ten percent of the available assimilative capacity for any given pollutant.

■ The same cannot be said for the EPA's approval of West Virginia's twenty percent *de minimis* provision for cumulative discharges. From the perspective of maintaining the water quality of a Tier 2 water body (which is the focus of § 131.12(a)(2)), the *de minimis* standard for cumulative discharges is more important than the *de minimis* standard for individual discharges; it is the former that will dictate the total reduction in available assimilative capacity that a water body may undergo without any Tier 2 review.[31]

---

31. The *de minimis* standard for individual discharges is important primarily to potential

dischargers, for that level will dictate how much any given discharger can contribute to

Without a cumulative cap on *de minimis* discharges, individual *de minimis* discharges could easily consume all of the available assimilative capacity for a given pollutant parameter, reducing water quality to the minimum level necessary to support existing uses without ever having undergone Tier 2 review. As for this twenty percent *de minimis* figure—clearly the more important of the two—the EPA has cited no evidence in the record to explain why a twenty percent reduction in available assimilative capacity can still be considered insignificant. The EPA argues that West Virginia's *de minimis* thresholds "were developed in accordance with EPA's recommendations, which were formulated after many years of intense effort by EPA National and Regional offices, numerous states, the environmental community, academia, industry and municipalities." EPA Reply Br. at 6–7. The court has acknowledged that this statement is true regarding the ten percent figure and has, accordingly, deferred to the EPA's approval of West Virginia's ten percent *de minimis* figure. None of the materials cited by the EPA, however, make any mention of a twenty percent cumulative *de minimis* figure.

While the EPA fails to provide any citations to record evidence in support of this figure, the Industrial Intervenors do supply some additional citations. First, the Industrial Intervenors point out that the Great Lakes Guidance allows cumulative discharges of certain chemicals to be considered *de minimis* so long as "at least ten percent of the total assimilative capacity remains unused following the lowering of water quality." Great Lakes SID at 207; AR 460. While the Industrial Intervenors do not provide further explanation, it appears that this standard would allow cumu-

lative discharges to use up to *ninety* percent of assimilative capacity and still be considered *de minimis*. If a ninety percent reduction can be considered *de minimis*, then obviously a twenty percent reduction can also be considered *de minimis*. There are several responses to this point. First, this standard from the Great Lakes SID applies only to certain specified pollutants. Second, the standard uses the phrase "total assimilative capacity" rather than "available assimilative capacity," which is the phrase used by the EPA in setting the individual *de minimis* standard and the phrase used by West Virginia in section 5.6.d. It is unclear whether these phrases mean the same thing. Significantly, the EPA has not argued to this court that a cumulative reduction in up to ninety percent of the available assimilative capacity for any pollutant would be a permissible *de minimis* standard. Most importantly, if the Great Lakes SID cited by the Industrial Intervenors does stand for the proposition that multiple individual discharges, each reducing the available assimilative capacity by less than ten percent, could be considered *de minimis* on a cumulative basis so long as those discharges used up no more than ninety percent of the available assimilative capacity, the court would reject that standard out of hand. It is hard to imagine how § 131.12(a)(2)'s command that "water quality shall be maintained and protected" would be satisfied by a provision that permitted a reduction in water quality of as much as ninety percent of a water body's available assimilative capacity for any given pollutant. Accordingly, the court the Industrial Intervenors' attempt to find support for the twenty percent cumulative *de minimis* figure in the Great Lakes SID.

the cumulative cap. From the perspective of water quality, however, it does not matter whether the number of discharges is one or

one hundred; the relevant question is how much water quality is lowered by any and all discharges into a water body.

In addition to that document, the Industrial Intervenors reference Colorado's anti-degradation procedures, which have been approved by the EPA. Ind. Br., Exh. 7. Colorado's procedures have a *de minimis* standard somewhat similar to that included by West Virginia. Under Colorado's procedures, discharges of certain pollutants (bioaccumulative toxic pollutants) are considered *de minimis* if the "new or increased loading from the source under review is less than 10 percent of the existing total load to that portion of the segment impacted by the discharge ...; provided, that the cumulative impact of increased loading from all sources shall not exceed 10 percent of the baseline total load ...." Ind. Br., Exh. 7, at 20. The Industrial Intervenors do not explain whether this standard, phrased in terms of percent of existing total load, is equivalent to a reduction in available assimilative capacity. Assuming that it is equivalent, Colorado's procedures in this regard fall within the ten percent figure that the court has already found to be reasonable in light of the evidence.[32] For all remaining pollutants, the Colorado procedures provide that a new or increased discharge will be considered *de minimis* if that discharge "will consume, after mixing, less than 15 percent of the baseline available increment, provided that the cumulative increase in concentration from all sources shall not exceed 15 percent of the baseline available increment." *Id.* Accordingly, it appears that Colorado's procedures permit a ten percent reduction (either individually or cumulatively) for certain chemicals and a fifteen percent reduction (either individually or cumulatively) for all remaining chemicals. In addition, however, these discharges are considered *de minimis* only on the further condition that the activity "will result in only temporary or short term changes in water quality. This [*de minimis*] exception shall not apply where long-term operation of the regulated activity will result in an adverse change in water quality." *Id.*

The court concludes that Colorado's procedures do not provide adequate support for West Virginia's twenty percent cumulative reduction figure. First of all, the fact that the EPA previously approved another State's plan is not evidence that the plan is consistent with minimum federal requirements—the EPA's approval of West Virginia's plan here is not in and of itself "evidence" that this court could rely on to conclude that West Virginia's plan meets minimum federal requirements. While the Industrial Intervenors point to Colorado's procedures, they do not point to any *evidence* (either within or outside the of record in this case) that Colorado or the EPA reasonably relied on in determining that fifteen percent was a permissible and reasonable figure.[33] Second, fifteen percent is, obviously, a lower figure than twenty percent. It remains the case that even if fifteen percent is an acceptable figure, no party has offered evidence as to why twenty percent is also an acceptable figure. Third, Colorado's procedures contains an important limitation, absent in West Virginia's procedures, that safeguards against the risk that supposedly *de minimis* discharges will degrade water quality over the long term.

---

32. If this standard is not equivalent to a ten percent reduction in available assimilative capacity, the Industrial Intervenors do not explain what the standard means or how it relates to West Virginia' standard in this case.

33. The court does not suggest that such evidence was lacking in Colorado's case. The point is rather that this court has no idea whether Colorado's fifteen percent was justified, because no party has submitted or cited to the evidence on which Colorado and/or the EPA relied.

In sum, because neither the EPA nor the Intervenors have cited to evidence supporting the EPA's approval of West Virginia's twenty percent *de minimis* figure, the court concludes that the EPA's approval of the twenty percent *de minimis* provision was arbitrary and capricious.

### 9. Tier 2.5

As explained above, the EPA's regulations establish three tiers of antidegradation review, and those tiers serve as the federal minimum below which State antidegradation procedures cannot fall. Nothing in the EPA's regulations, however, prevents States from setting standards above the federal minimum. In its antidegradation implementation procedures, West Virginia, like a number of other States, created an additional tier of antidegradation protection, designated as Tier 2.5. Tier 2.5 provides greater protection than Tier 2 for certain high quality waters that the State deems deserving of heightened protection, but which do not qualify for Tier 3 protection. Because Tier 2.5 is not required by EPA regulations, the only restriction on West Virginia's Tier 2.5 standards is that they not fall below the minimum standards set for Tier 2.

### (a) Ten Percent *De Minimis* Standard

The plaintiffs raise an objection to similar *de minimis* provisions included in section 60–5–6.3.a, which applies to waters classified as Tier 2.5. Except for the four pollutants discussed below in part IV.9.b, Tier 2.5 contains the same *de minimis* provision for individual discharges as Tier 2—ten percent of remaining assimilative capacity for each pollutant—but contains a stricter *de minimis* provision for cumulative discharges, which is also set at ten (rather than twenty) percent. The court has already concluded in part IV.8 that ten percent is an acceptable *de minimis* figure. For the reasons stated in part IV.8, then, the court concludes that the EPA's

approval of these *de minimis* provisions for Tier 2.5 was reasonable.

### (b) Four pollutants given numerical values

■ Apart from establishing the ten percent individual and ten percent cumulative standards for Tier 2.5 waters, section 60–5–6.3.a sets specified numerical criteria defining "significant degradation" for four categories of pollutant: dissolved oxygen, pH, fecal coliform, and temperature. Specifically, the regulations provide that discharges affecting these categories will be deemed insignificant so long as: (1) a dissolved oxygen discharge does not result in a dissolved oxygen sag greater than 0.4 ppm, section 6.3.a.1; (2) pH is maintained between 6.0 and 9.0, section 6.3.a.2; (3) thermal discharges do not increase temperature more than two degrees Fahrenheit, section 6.3.a.3; and (4) fecal coliform concentrations average no more than 200/100 ml monthly and 400/100 ml daily, section 6.4.a.4. The plaintiffs object to these numerical criteria on the basis that there is no evidence in the record to suggest that discharges of dissolved oxygen, pH, thermal discharges, or fecal coliform that fall within these boundaries will not significantly affect water quality.

■ In response, the EPA argues that these four categories of pollutants are not susceptible to analysis based on percentage reduction of assimilative capacity. The plaintiffs do not contest that this is true, but reiterate that there is no evidence in the record showing that these particular numerical criteria are truly insignificant. Apart from stating that the use of numerical criteria for these pollutants is superior to the use of assimilative capacity reduction, the EPA simply states that "[b]ecause it is a reasonable interpretation of 40 C.F.R. § 131.12(a)(2) to include such a threshold, EPA's approval

should be upheld." EPA Op. Br. at 21.[34] Remarkably, the EPA cites to nothing in the record in support of its proposition that these *particular* numerical criteria represent a level of degradation that is harmless or trivial. The EPA has provided this court with no explanation whatsoever as to the significance of numerical criteria such as a minimum 0.4 parts mg/l "sag" of dissolved oxygen or 200/100 ml monthly or 400/100 ml daily average concentrations of fecal coliform. The EPA cites to no discussion of the effects (or lack thereof) of these amounts of these pollutants on water quality, or to any scientific data from which the EPA could conclude that these pollutants within these ranges do not result in a "lowering" of water quality. The EPA simply rests on its right to define some minimum amount of degradation as trivial and therefore not "really" degradation, but does not even attempt to explain why the particular numerical criteria chosen here have any meaning. The court is fully aware that "an agency's data selection and choice of statistical methods are entitled to great deference and its conclusions with respect to data and analysis need only fall within a 'zone of reasonableness'." *Reynolds Metals Co. v. EPA,* 760 F.2d 549, 559 (4th Cir.1985) (citations omitted). "This standard, however, does not compel [the court] to abdicate [its] judicial function, and [the court is] mindful that the Agency must fully explicate its course of inquiry, its analysis, and its reasoning." *Id.* (quotation marks and citation omitted). In this case, the EPA has cited no data in support of these numerical criteria. Accordingly, the court concludes that the EPA's approval of West Virginia's numerical criteria in section 6.3.a was arbitrary and capricious.

## 10. Trading provisions

■■■ The plaintiffs' final challenge to the EPA's approval of West Virginia's antidegradation implementation procedures concerns certain water quality trading provisions. The trading provisions state that a proposed new or expanded discharge will be allowed, without triggering antidegradation review, "where the applicant agrees to implement or finance upstream controls of point or nonpoint sources sufficient to offset the water quality effects of the proposed activity from the same parameters and insure an improvement in water quality as a result of the trade.... A trade may be made between more than one stream segment where removing a discharge in one stream segment directly results in improved water quality in another stream segment." Section 5.6.f. These trading provisions are present in the regulations governing all four Tiers of protection (Tiers 1, 2, 2.5, and 3). *See* section 60–5–4.8, 5–5.6.f, 5–6.3.h, 5–7.5.[35]

The plaintiffs raise several objections to these trading provisions. First, the plaintiffs argue that the trading provisions permit a new or expanded source to discharge into a water segment that does not meet water quality standards. This violates EPA regulations regarding NPDES permits, the plaintiffs argue, which prohibit further discharges into non-compliant water quality segments unless certain strict controls are in place. *See* 40 C.F.R. §§ 122.4(i), 122.44(d). In response, the EPA agrees with the plaintiffs' statement

---

**34.** The EPA adds nothing further in its reply brief, but simply states that "EPA explained in EPA's Op. Br. the scientific basis for establishing thresholds for these pollutants through numeric criteria rather than based on a percent of assimilative capacity." EPA Reply Br. at 8.

**35.** Section 4.8, the trading provision governing Tier 1 waters, is worded slightly differently than the other three sections. As it relates to the plaintiffs' objections, however, section 4.8 is the same as the other sections.

regarding its NPDES regulations, but disagrees that the antidegradation trading provisions authorize West Virginia to permit discharges that would otherwise violate NPDES standards. The court agrees that the antidegradation trading provisions merely permit a new or expanded discharge to satisfy *antidegradation* requirements in certain circumstances; those provisions do not purport to exempt (and do not exempt) those discharges from limits imposed by other regulations, such as NPDES permit regulations.

Second, the plaintiffs argue that the trading provisions are illegal because they permit an applicant to offset new or expanded point source discharge with a reduction in nonpoint source discharge. Because West Virginia has neither developed nor implemented a system for quantifying nonpoint source pollution, the plaintiffs argue, it cannot permit an applicant to trade some unquantified reduction in nonpoint source pollution for a quantified increase in point source pollution. To put it another way, the plaintiffs argue that it will be impossible for West Virginia to ensure that a reduction in nonpoint source pollution truly offsets an increase in point source pollution, because West Virginia has no method of quantifying nonpoint source pollution. In response, the EPA argues that this objection is premature, as it pertains to the implementation of the trading provisions rather than the provisions themselves. The EPA notes that its approval of this program "does not mean that West Virginia will attempt to use these provisions without first developing a quantification method to ensure that trades with nonpoint sources meet the conditions specified in the trading provisions.... EPA understands that West Virginia is developing that method now and EPA expects that West Virginia will not use these trading provisions until that method has been developed." EPA Op. Br. at 46 n. 50.

The court agrees with the EPA that the plaintiffs' objection in this regard pertains to the implementation of these provisions, not to the validity of the provisions themselves. The trading provisions require, among other things, that the reduced upstream pollution be "sufficient to offset the water quality effects of the proposed activity," that "where uncertainty exists regarding the effluent trade, an adequate margin of safety will be required," and that "the trades must be enforceable." Section 5.6.f. If West Virginia were to permit trading between point sources and nonpoint sources without any means of quantifying the reduction in nonpoint source pollution, it would clearly be violating these parts of its own regulation. Thus, the EPA is entirely reasonable in interpreting West Virginia's trading provisions as requiring that nonpoint source pollution reduction be quantifiable before any trading with nonpoint sources will be permitted. This objection is therefore without merit.

Finally, the plaintiffs argue that the trading provisions for Tiers 2, 2.5 and 3 are inconsistent with EPA regulations because they permit trading between two different stream segments without requiring an improvement in the same stream segment where the new or expanded discharge occurs. That is, the plaintiffs argue that under the trading provisions, an individual would be permitted to lower the water quality in one stream segment without antidegradation review so long as that individual improves another, different stream segment. The EPA agrees with the plaintiffs that its regulations do not permit the degradation of one stream segment without antidegradation review simply because another, different stream segment is improved. The EPA states that trading without antidegradation review is only permissible when the stream segment where the new or expanded discharge oc-

curs experiences a net improvement in water quality. The EPA argues, however, that the West Virginia trading provisions are consistent with this approach.

The trading provisions state that trading is permissible when "upstream controls of point or nonpoint sources [are] sufficient to offset the water quality effects of the proposed activity from the same parameters and insure an improvement in water quality as a result of the trade." Section 5.6.f. In addition, the provision states that "[a] trade may be made between more than one stream segment where removing a discharge in one stream segment directly results in improved water quality in another stream segment." Section 5.6.f. The court concludes that these statements, taken together, are ambiguous as to whether the improvement must occur in the same stream segment where the discharge takes place, or whether an improvement in one stream segment may be traded for a decrease in quality in another stream segment. The EPA's conclusion that the trading provisions mean the former is a reasonable interpretation of those provisions, and thus the court will defer to that interpretation. The part of section 5.6.f that refers to improvement in quality in "another stream segment" seems to suggest that one segment may be degraded if *another* segment is improved. This statement must be read in light of the first part of section 5.6.f, however, which provides that the reduction must be "sufficient to *offset* the water quality effects of the proposed activity," and that the trade must "insure an *improvement* in water quality." These provisions can reasonably be read to mean that the trade must result in an improvement in water quality in the water segment where the new or expanded discharge is located. Because this interpreta-

tion of the trading provisions is reasonable, the EPA's approval of these provisions was not arbitrary or capricious.

## V. Conclusion

All in all the plaintiffs have raised challenges to the EPA's approval of what the court has construed as thirteen different parts of West Virginia's antidegradation procedures.[36] The court has concluded that the EPA's approval of West Virginia's plan was reasonable as to six of these issues but arbitrary and capricious as to the remaining seven issues. To summarize, the court has concluded that:

1. The EPA's approval of section 4.3, which classifies large segments of the Kanawha and Monongahela Rivers as Tier 1 waters, was not based on adequate evidence in the record regarding the quality of waters in those rivers. Accordingly, this approval was arbitrary and capricious.

2. The EPA's approval of section 5.6.a.2, which generally requires Tier 2 review only to new or expanded discharges, but also provides for Tier 2 review when an existing permitted discharge results in ongoing degradation, was reasonable.

3. The EPA's approval of section 5.6.c, which allows a discharge from a publicly owned wastewater treatment facility so long as there is a "net decrease in the overall pollutant loading," was arbitrary and capricious.

4. The EPA's approval of section 3.7, which requires Tier 2 antidegradation review for discharges under a general section 402 or section 404 permit only at the time the general permit is issued, and not for individual discharges under such permits, was arbitrary and capricious.

---

**36.** The plaintiffs identify ten main issues, three of which consist of two sub-issues, for a total of thirteen.

5. The EPA's approval of section 1.5.b, which states that nonpoint sources will be deemed in compliance if best management practices are installed and maintained, was reasonable.

6. The EPA's approval of section 5.6.c, which affords the State the power to exempt classes or categories of activities from Tier 2 review but does not reflect the State's existing powers under section 303(c) of the CWA, was arbitrary and capricious.

7. (a) The EPA's approval of section 5.2, which provides that "[w]ater segments that support the minimum fishable/swimmable uses and have assimilative capacity remaining for some parameters" shall only "generally" be provided Tier 2 protection, was arbitrary and capricious.

(b) The EPA's approval of section 5.3, which gives the WVDEP Secretary the discretion in certain circumstances to determine whether such waters are overall of a high quality, was reasonable.

8. (a) The EPA's approval of section 5.6.a.1, insofar as that provision allows for a ten percent reduction in the available assimilative capacity of individual pollutant parameters from an individual discharge before Tier 2 review is required, was supported by evidence in the record and therefore was reasonable.

(b) The EPA's approval of section 5.6.a.1, insofar as that provision allows for a twenty percent cumulative reduction from all discharges before Tier 2 review is required, was not supported by any evidence in the record and therefore was arbitrary and capricious.

9. (a) The EPA's approval of section 6.3.a, which allows for a ten percent reduction, whether individually or cumulatively, in available assimilative capacity before Tier 2.5 review is required, was reasonable.

(b) The EPA's approval of section 6.3.a.1–4, which set numerical criteria for four individual pollutant parameters, was not supported by any evidence in the record and was therefore arbitrary and capricious.

10. The EPA's approval of the trading provisions, sections 4.8, 5.6.f, 6.3.h, and 7.5, which can reasonably be read to require that the trade must result in an improvement to water quality in the water segment where the new or expanded discharge is located, was reasonable.

For the reasons stated above, the court **GRANTS** the plaintiffs' motion for summary judgment and **DENIES** the motions for summary judgment filed by the EPA and the defendant-intervenors. The court **VACATES** the EPA's approval of West Virginia's antidegradation procedures and **REMANDS** to the EPA for further proceedings consistent with this opinion.[37]

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov.*

---

**37.** The plaintiffs make no mention in their motion for summary judgment of their request in the complaint for costs and attorneys' fees. If the plaintiffs still seek an award of costs and fees, they should pursue such an award by separate motion.